Lois JAMIESON, Plaintiff,

v.

POUGHKEEPSIE CITY SCHOOL DISTRICT, Thomas F. Halley, Geraldine F. Samselski, Paul Monaco, sued individually and in their respective capacities as members of the Poughkeepsie City School District Board of Education, Defendants.

No. 00 CIV. 4989(CM).

United States District Court,
S.D. New York.

March 20, 2002.

Michael H. Sussman, for plaintiff.

Marie Ann Hoenings, LBC&C, for PCSD, Monaco, defendants.

Andrew G. Tretter, McDonough Marcus Cohn Tretter Heller & Kanca, LLP, for Halley, defendant.

Antonia Kousoulas for Samselski, defendant.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

The Poughkeepsie City School Board (the "Board"), by a 3–2 vote, voted against renewing the employment contract of Dr. Lois Jamieson ("plaintiff" or "Jamieson"), Superintendent of the defendant Poughkeepsie City School District (the "District"). Each of the individually named defendants, Thomas Halley, Geraldine Samselski and Paul Monaco, voted against renewal. Plaintiff brings this race discrimination action pursuant to 42 U.S.C.

§§ 1981 and 1983 and the Fourteenth Amendment of the United States Constitution, and the New York Human Rights Law, as codified in the New York State Executive Law, §§ 290 *et seq.*.

Defendants have moved separately for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] The District has also moved to dismiss plaintiff's claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## FACTS PERTINENT TO THE MOTION

On a motion for summary judgment, the Court views the facts most favorably to the non-moving party—in this case, the plaintiff—and draws all inferences in the plaintiff's favor. *See Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996).

### 1. *The Appointment*

By 1997, plaintiff had worked over 32 years in the Yonkers School District. She served as a teacher and then principal for several years, and then moved into a series of leadership positions within that School District's central administration. During her last three years in the Yonkers School District, plaintiff was Assistant Superintendent in charge of Pupil Support Services. She received her PhD in Education Administration from Columbia in 1994. Plaintiff's evaluations as a school administrator in Yonkers were uniformly positive. Jamieson Dep. 12–51.

Defendant Geraldine Samselski was elected to the School Board in May 1997. In May of 1998, Samselski was elected to serve a one year term as President of the Board. She remained on the Board until June 2000. Defendant Thomas Halley was

elected to the Board in 1997. Halley served on the Board during the 1997–1998 academic school year, as vice-president of the Board during the 1998–1999 school year, and as president of the Board during the 1999–2000 school year. Halley 56.1 Stmt. ¶ 2. Defendant Paul Monaco was elected to the School Board in 1998, and has remained a Board member to this day. Monaco and District 56.1 Stmt. ¶¶ 3–4.

In June 1997, the Poughkeepsie School Board voted unanimously to hire plaintiff as Superintendent. Jamieson Sep. 66–92; Samselski Dep. 15. Although present at plaintiff's Board interview, neither Samselski nor Halley could vote regarding her hiring because plaintiff was selected before they became voting Board members. Samselski Dep. 9–11; Jamieson Dep. 72–73; Halley Dep. 13. Monaco was not yet a Board member.

### 2. *The 1997–1998 School Year*

During her first year as Superintendent, plaintiff claims that most, if not all of her proposals to improve the District's performance were passed by the Board, Jamieson Dep. 138–139, but Samselski and Halley often voted against plaintiff's proposals. Jamieson Dep. 139, 146; Watkins Aff. ¶ 3, Ex. 2.

Plaintiff further alleges that during this first year, Samselski made comments to plaintiff suggesting that she harbored a racial bias against plaintiff. Examples of these alleged comments and actions are as follows:

- Plaintiff was late to a board meeting and Samselski confronted her in the parking lot and said, "You are going to be late all the time. I know your kind." Jamieson Dep. 139–140.

---

1. Both Halley and Samselski filed motions for summary judgment on their own behalf. The

Poughkeepsie City School District and Monaco moved for summary judgment together.

- After a Session of the Board, Samselski said to plaintiff, "I did my homework on you in Yonkers. I know you only hire blacks." Jamieson Dep. 233, 400–401, 460–461.
- Samselski refused to address plaintiff as Dr. Jamieson, even though plaintiff requested the Board to address her as such. Jamieson alleges that Samselski addressed her as "Lois," and on one occasion addressed her as "Doc." Jamieson Aff. ¶ 4; Jamieson Dep. 467.
- Samselski referred to plaintiff by often using the term "you people." Jamieson Dep. 148–149.

Plaintiff does not allege that defendant Halley made overtly biased comments in plaintiff's presence during her first year, but does allege that he publicly embarrassed plaintiff "in a manner that suggested a lack of respect for her." Plaintiff claims that Halley publicly lambasted her in a newspaper article for proposing to volunteer her husband's services as an education consultant in the District. Referring to plaintiff's failure to publicly disclose that the person she proposed to the Board was her husband, Halley was quoted as saying, "I believe it's a very clear conflict of interest. . . . It doesn't set a good example for students in the District as to how a public official should conduct himself or herself." Watkins Aff. ¶ 4, Ex. 3; Jamieson Dep. 323–324.

Plaintiff also alleges that Halley, while opposing a proposed school program, displayed racial animus toward her at a Board meeting. Plaintiff called on a group of Latino people to make a presentation for the program before the Board. Plaintiff alleges that Halley said that the presenters weren't reputable and that plaintiff was responsible for bringing them into the District. Jamieson Dep., 374–375. Plaintiff interpreted this comment as racially discriminatory. *Id.* Halley states that this comment could not be interpreted as racially motivated because he did not even know that the presenters were Latino; he thought that they were Caucasian. Halley 56.1 Stmt. ¶¶ 18 & 20. He argues that he was only remarking on the presenters' credibility.

Plaintiff further alleges that Halley acted in a discriminatory manner toward her in his opposition to the plaintiff's practices and policies concerning student discipline. She claims that he criticized her for being too lenient in her discipline of African–American students. Jamieson Dep. 357–358. Halley claims that his opposition to plaintiff's discipline practices and policies was not racially motivated because he did not even know the race of the children being disciplined. Halley 56.1 Stmt. ¶ 25. He felt that plaintiff was too lenient overall.

In her first year, plaintiff received very high marks from 3 of 5 of the Board Members. Samselski and Halley gave her much lower marks. Watkins Aff. ¶ 5, Ex. 4. They gave no explanation for their evaluations. Jamieson Dep. 187–190; 194–195.

### 3. *The 1998–1999 School Year*

Defendant Monaco was elected to the Board, and Samselski was elected Board President, effective July 1998. Monaco Dep. 47–48.

In July 1998, plaintiff alleges that Samselski accused her of conspiring with an African American elementary school principal in filing a complaint against Samselski with the Dutchess County Human Rights Commission. Samselski threatened to bring plaintiff up on disciplinary charges. Jamieson Aff. ¶ 5; Jamieson Dep. 506–511. Plaintiff claims that this accusation was untrue and unsubstantiated. After this threat, plaintiff retained legal counsel. Watkins Aff. ¶¶ 6–7, Exs. 5 &

6. Jamieson's attorney, Michael Sussman, wrote to Samselski regarding the baseless charge. Watkins Aff. ¶ 6, Ex. 5.

In August 1998, Samselski allegedly told plaintiff "I don't believe that the School District needs a Black Superintendent. You are not going to be here. Either you accept the offer for a buy-out [of your contract] or I'll make it impossible for you to work here. I've got the votes." Jamieson Dep. 338–339; *see also* Monaco Dep. 53–55 (confirming that Samselski proposed a buy-out of Jamieson's contract to the board, and mentioned having had a conversation with Jamieson).

Plaintiff rejected the buy-out offer, and alleges that Samselski, with the support of Halley and Monaco, endeavored to make her job "impossible." Watkins Aff. ¶ 7, Ex. 6. In a letter to David Shaw, Esq., counsel for the School Board, plaintiff's attorney expressed her rejection of the proposed buy-out, her refusal to make a counter-proposal. Mr. Sussman expressed plaintiff's concerns that Samselski and "another board member" "engaged in acts to undermine her Superintendency." These acts included, but were not limited to:

> publicly embarrassing the Superintendent and her husband, Donald Duncan, last January when he volunteered to conduct needed human relations training at the middle school; inviting the president of the teachers' union to address an executive session of the School Board and then not providing Dr. Jamieson an opportunity to respond to her baseless claims and charges; interfering with the implementation of an improved security program at the middle school; spearheading a ludicrous investigation into claims that another African–American principal "mimicked" the school board president; repetitively and again baselessly questioning Dr. Jamieson's residency and the status of her out-of-dis-

trict home despite clear evidence that Dr. Jamieson resides at 181 Academy Street in Poughkeepsie; associating the Superintendent, solely on account of her race, with "hatred" the Board President claims was expressed at a recent school board meeting by "your black community," *e.g.*, parents aggrieved by what they perceive to be school board interference with the Pop Warner program. *Id.*

Mr. Sussman further informed Mr. Shaw that "there is a scurrilous and racially polarizing campaign being waged against Dr. Jamieson," and it "must stop and stop now." *Id.*

Plaintiff alleges that Samselski, Halley and Monaco consistently blocked plaintiff's proposals to improve the District's performance, and publicly and privately denigrated her. Jamieson Aff. ¶ 20; Jamieson Dep. 192, 234–235, 245–246, 323–329, 374–375. As an example, plaintiff alleges that Samselski told plaintiff that she did not know how to write and was "illiterate." Jamieson Dep. 127–128. Furthermore, after one Board meeting when members of the community expressed concern over the Board's direction, Samselski accused plaintiff of bringing "your Black community" to the meeting. Jamieson Dep. 441–442.

In or about May/June 1999, plaintiff was supposed to receive her performance evaluation for the 1998–99 year. Before plaintiff received her evaluation, Samselski leaked to the press that plaintiff's contract would not be renewed because of an unsatisfactory performance evaluation. Jamieson Dep. 245–246; 473–475.

In June 1999, plaintiff was given her evaluation. Two of the five non-defendant board members refused to participate in plaintiff's evaluation because they believed the Board was violating plaintiff's contract and State Education Law by not setting written standard for plaintiff's performance. Watkins Aff. ¶¶ 8–9, Exs. 7 & 8.

Board Member Koloski wrote a letter to Samselski, which was copied to the other Board members and Mr. Shaw, expressing his objections to the incorrect form and procedure of plaintiff's evaluation. *Id.* Koloski was one of the non-voting Board members.

In June 1999, the Board voted 3–2 not to renew plaintiff's contract. Samselski, Halley and Monaco voted against the renewal. Plaintiff alleges that defendants did so despite the Poughkeepsie Journal's endorsement of plaintiff and other outspoken support from the community, and that their votes were motivated by racial animus to her. Watkins Aff. ¶ 12, Ex. 11; Jamieson Dep. 241–242. Jamieson's contract terminated on July 14, 2000.

### 4. *The 1999–2000 School Year*

Halley replaced Samselski as Board president in July 1999. Jamieson Dep. 196. This occurred after plaintiff's contract renewal was denied.

In the Spring of 2000, Halley and Samselski were voted out of office, and two individuals who supported Jamieson were elected. The new members' terms did not begin until July 2000. Halley Dep. 8; Samselski Dep. 5; Monaco Dep. 74–75; Jamieson Aff. ¶ 6. While they were lame duck Board members, Halley and Samselski, along with Monaco, voted to replace plaintiff with a white male, Thomas Carlisle. Monaco Dep. 68–69, 72–73. Carlisle withdrew his acceptance of his offer in June 2000 when he learned that he did not have the support of the two other board members and the two incoming board members. Halley Dep. 60; Watkins Aff. Ex. 17.

Before Carlisle withdrew his acceptance, defendants were placed on notice that plaintiff might take legal action against them. Watkins Aff. ¶ 13, Ex. 12. In a letter to Mr Shaw, Mr. Sussman requested that the incoming board members, rather than the lame duck board members, elect the new Superintendent. Mr. Sussman also wrote, "as you are aware from my prior correspondence, Dr. Jamieson is of the view that members of the current Board have acted toward her with racial animosity and bias. She has not been provided with a fair chance to succeed and the Board has violated her contract. While by extending her appointment, the new Board could effectively moot Dr. Jamieson's need to take legal action, nothing herein is intended to waive that right should the current Board continue along its course and seek, albeit with undetermined legal consequence, to pre-empt that option." *Id.*

When the lame duck Board voted again in June 2000, they voted to appoint an African–American male, Robert Watson. Watson had less experience in central administration than plaintiff, and was not even considered by the Board during its initial search for plaintiff's replacement. Samselski Dep. 10–11; Halley Dep. 56–57. Watson was not interviewed before his election. Samselski Dep. 115. Plaintiff alleges that defendants voted in an African–American to protect them from legal action. Watson was re-elected by the newly constituted Board, and currently serves as Superintendent of the District.

### 5. *The Federal Action*

On or about July 7, 2000, plaintiff filed this action. She alleges that "by failing to extend her employment contract on the basis of her race and by effectively terminating her employment for the same reason, defendants violated 42 U.S.C. secs. 1981, the Fourteenth Amendment to the United States Constitution, as made actionable by 42 U.S.C. sec.1983, and section 296 of the Executive Law of the United States." Complaint ¶ 44. Plaintiff seeks

compensatory damages for lost wages, adverse emotional consequences, and, against the individual defendants, "punitive damages in a sum sufficient to deter similarly-situated state actors from engaging in racial discrimination in employment." Plaintiff also seeks fees and costs, and pre- and post-judgment interest on her lost wages.

Defendants' motions for summary judgment are disposed of as follows:

## DISCUSSION

### 1. *Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505.

Because Jamieson alleges discriminatory treatment in violation of § 1983, the Court applies the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell*

*Douglas,* the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in [discrimination] cases." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). Under this framework, plaintiff first must establish a prima facie case of discrimination. To establish a prima facie case, plaintiff must show that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) she was performing her duties satisfactorily; and (4) the circumstances surrounding the employment action give rise to an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. 1817. Plaintiff's burden of establishing a prima facie case is *de minimus. McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997); *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 203–04 (2d Cir.1995). "Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination with respect to the circumstances that give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *McLee,* 109 F.3d at 135; *see also Cronin,* 46 F.3d at 204.

Once a plaintiff proves his prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of production then shifts to the employer to "produc[e] evidence that plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The employer's explanation must

be clear and specific, so that the employee has an opportunity to demonstrate pretext. *See Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985).

Should the defendant carry this burden, the plaintiff must then demonstrate that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp.,* 411 U.S. at 802, 804, 93 S.Ct. 1817). To satisfy this burden, the plaintiff must show that: (1) the defendant's actions were pretextual; and (2) discrimination played a role in the decision. *St. Mary's Honor Center v. Hicks,* 509 U.S. at 515, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *Dryden v. Tiffany & Company,* 919 F.Supp. 165, 166–67 (S.D.N.Y.1996); *Gallo v. Prudential Residential Svcs. Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994). While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff. *See id.* at 253, 101 S.Ct. 1089, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207; *St. Mary's Honor Ctr.,* 509 U.S. at 507, 113 S.Ct. 2742.

In her opposition to summary judgment, plaintiff argues that she is entitled to a burden-shifting instruction under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), because "she has adduced direct evidence of discrimination by a decisionmaker." The *Price Waterhouse* analysis requires plaintiff to initially sustain a heavier burden than under *McDonnell Douglas*— plaintiff must initially show that discriminatory animus was a "substantial part of the adverse employment decision, so that the factfinder infers both permissible and discriminatory motive." *See Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997).

"In short ... the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment." *Jalal v. Columbia Univ.,* 4 F.Supp.2d 224 (S.D.N.Y. 1998) (quoting *de la Cruz v. New York City Human Resources Admin.,* 82 F.3d 16, 23 (2d Cir.1996)). If this burden is met, the burden shifts to the employer to show that it would have made the same employment decision even absent the discriminatory criterion. *See Raskin,* 125 F.3d at 60.

Without ruling out the possibility of a *Price Waterhouse* burden shifting instruction at trial, this Court will decide these motions as they have all been briefed (including plaintiff's)—under the *McDonnell Douglas* analysis.

 Summary judgment is sparingly used in discrimination cases where intent and state of mind are at issue, *see Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989), because, as this Circuit has emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination, *see Graham v. Long Isl. R.R.,* 230 F.3d 34, 38 (2d Cir.2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999); *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996).

2. *The New York Cause of Action is Time–Barred*

 Defendants argue that plaintiff's claim under § 296 of the New York Executive Law must be dismissed because plaintiff did not file a timely notice of claim within 90 days of the adverse employment action. Plaintiff contends that she did file a timely notice of her claim.

New York Education Law § 3813(1) provides that a plaintiff has three months

to provide a "written verified claim upon which such action or special proceeding is founded" to the governing body of the school district. Plaintiff filed her Complaint on July 7, 2000. Defendants argue that the accrual of plaintiff's claim began on June 28, 1999 when the Board made its decision not to renew plaintiff's contract. Plaintiff argues that her claim began to accrue in June 2000 when the Board selected Watson to replace her. She contends that after Carlisle withdrew his acceptance, the lame duck Board could have allowed the incoming Board to vote and reverse the earlier decision not to renew plaintiff's contract.

Plaintiff's claim is clearly founded on the Board's decision not to renew her contract, not on the Board's decision to hire Watson. As such, plaintiff's claim began to accrue a full year before her complaint was filed. Plaintiff's New York state law claim is dismissed because she did not file a verified complaint within three months of the adverse employment decision.

### 3. *Actions against Samselski, Halley and Monaco*

#### A. *Prima facie case*

Plaintiff satisfies the first three prongs of the *McDonnell Douglas* prima facie analysis. An African–American, she is a member of a protected group. Although some people, especially defendants, disagreed with some of her actions as Superintendent, there is no indication that plaintiff was not qualified for the position of Superintendent. *See de la Cruz v. New York City Human Resources Admin. DSS*, 82 F.3d 16, 20 (2d Cir.1996) ("To satisfy the second element of the test, plaintiff need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he 'possesses the basic skills necessary for performance of [the] job.' ") (quoting *Powell v. Syracuse Univ.*,

580 F.2d 1150, 1155 (2d Cir.1978)). Plaintiff suffered an adverse employment action when the Board voted not to extend her three-year contract.

#### (1) Plaintiff satisfies the fourth prong

Defendants allege that plaintiff has failed to establish a prima facie case of race discrimination because she has failed to proffer any evidence to satisfy the final prong: that the adverse actions occurred under circumstances giving rise to an inference of discrimination. Defendants argue that plaintiff's assertions that the Board voted not to renew her contract because of her race are unfounded because (1) plaintiff's three predecessors and current successor are all African American, and (2) the evidence does not support the allegation that Samselski, Halley and Monaco voted as a bloc against plaintiff's proposals and recommendations because of her race.

Plaintiff counters that she sufficiently established that the vote not to renew her contract occurred under circumstances giving rise to an inference of discrimination. She points to Samselski's racially biased comments, Halley's public embarrassment of her and her husband, and the fact that Halley and Monaco, even after being put on notice from plaintiff and from plaintiff's attorney that she felt she had been treated in a discriminatory manner, voted to oust plaintiff from the position of Superintendent. Furthermore, plaintiff argues that the fact that she was ultimately replaced by an African -American is not fatal to her claim of discrimination, especially not in this situation. Plaintiff claims that Watson was only selected after the Caucasian appointee withdrew his acceptance, and that Watson was not even interviewed by the Board and that he had much less experience than plaintiff. She argues that from Watson's inferior qualifications, combined

with the fact that the Board was on notice of her potential legal action when it elected Watson, a trier of fact could infer that the election of Watson was an attempt to thwart a future discrimination claim.

■ The burden of proof that must be met to permit an employment discrimination action to survive a summary judgment motion at the prima facie stage is *de minimus*. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988). I must decide whether plaintiff has proffered evidence that shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. "It is not the province of the summary judgment court itself to decide what inferences should be drawn." *Chambers,* 43 F.3d at 38.

■ The fourth prong of the *McDonnell Douglas* analysis requires only that plaintiff establish circumstances giving rise to an *inference* of discrimination. In assessing whether plaintiff has met this test, "the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (quoting *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989)). As a result, one alleging discrimination usually is forced to rely on circumstantial evidence. *See, e.g., Chambers,* 43 F.3d at 37.

■ The Second Circuit has found that circumstances contributing to a permissible inference of discriminatory intent in an employment discrimination action may include the employer's continuing, after the employee's discharge, to seek applicants from persons of employee's qualifications to fill that position, an employer's criticism of plaintiff's performance in ethnically degrading terms, an employer's invidious comments about others in employee's protected group, employer's more favorable treatment of employees not in plaintiff's protected group, the sequence of events leading to the employees's discharge or the timing of the discharge. *See Chambers,* 43 F.3d at 37–38 (internal citations omitted). Some of these circumstances are present here. Plaintiff has proffered evidence that shows circumstances of Samselski criticizing plaintiff's performance in ethnically degrading terms, evidence of invidious comments made by Samselski about others in employee's protected group, and an escalating sequence of events leading up to plaintiff's discharge. This satisfies the *de minimus* burden.

■ Defendants' argue that plaintiff cannot sustain her inference of discrimination because her predecessors were African–American, her successor is African–American, and the school board has elected several African–American principals and administrators. However, discrimination against one person cannot be cured by favorable treatment of other employees in the same protected group. *See Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001) (citing with approval *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996), which rejected the argument that plaintiff's replacement by a worker of the same race precluded the establishment of a prima facie case of race discrimination); *see also O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (holding that it is not an element of plaintiff's prima facie case to show that he was replaced by someone outside of his protected class). This does not mean that the board's track record of electing African–Americans is

meaningless. It simply has no place in the first stage of this three-part analysis.

### B. Plaintiff's claims against Samselski

### (1) Samselski's non-discriminatory reasons for not renewing plaintiff's contract

Plaintiff has established a prima facie case under the *McDonnell Douglas* test. There is now a presumption that the employer unlawfully discriminated against the employee, and the burden of production shifts to the employer to produce evidence that plaintiff was rejected for a "legitimate, nondiscriminatory reason." *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). The employer's explanation must be clear and specific, so that the employee has an opportunity to demonstrate pretext. *See Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985).

■ Samselski contends that there were numerous legitimate reasons for not renewing plaintiff's employment contract. Samselski claims that her evaluation of plaintiff's performance as Superintendent and her vote against renewing plaintiff's appointment was based upon plaintiff's poor judgment, poor communication skills, ineffective leadership, plaintiff's inability or unwillingness to adhere to the School District's policies with regard to discipline and personnel actions, and plaintiff's failure to provide timely and adequate information and reports to the Board. Samselski 56.1 Stmt. ¶ 78; Samselski Aff. ¶¶ 7–28.

Samselski's reasons for voting against the renewal of plaintiff's employment contract meet her burden of production under the *McDonnell Douglas* test, and the burden now switches back to plaintiff to raise a genuine issue of fact. She has succeeded in doing so.

### (2) There is a genuine issue of material fact as to *whether Samselski's reasons for dismissal are pretextual*

■ At the third *McDonnell Douglas* stage, plaintiff must demonstrate that the legitimate reasons offered by the defendant were not her true reasons, but were a pretext for discrimination. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp.,* 411 U.S. at 802, 804, 93 S.Ct. 1817). To establish that Samselski's proffered reasons for discharging plaintiff were pretextual, plaintiff must demonstrate through direct, circumstantial, or statistical evidence that defendant's reasons for her votes were false, and it was more likely that she voted not to renew plaintiff's contract because she was African–American. *Gallo,* 22 F.3d at 1226; *Fullerton v. The Prudential Life Insurance Co. of America,* 2000 WL 1810099, at *7 (S.D.N.Y.2000). Once a defendant has provided a neutral rationale for the employment action, the factual inquiry proceeds to a new level of specificity. *Id.; see also St. Mary's Honor Ctr.,* 509 U.S. at 516, 113 S.Ct. 2742.

Samselski's concerns over plaintiff's performance are very much issues in dispute in this action. There is sufficient evidence in the record from which a jury could find in Samselski's favor, and were this Court deciding the *plaintiff's* motion for summary judgment, it would have to be denied on that basis. *See Cartagena v. Ogden Serv. Corp.,* 995 F.Supp. 459, 462 (S.D.N.Y. 1998).

■ But plaintiff does not need to prove that the discriminatory animus was the sole, or even the principal reason for the adverse employment action—only that it was *a* motivating factor. *See id.; Raskin v. Wyatt Co.,* 125 F.3d 55, 55 (2d Cir.1997). At trial, a defendant must then

prove that plaintiff would have been fired regardless of the discriminatory animus. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 121 (2d Cir.1997).

Samselski does provide several non-discriminatory reasons for casting her vote against renewal of plaintiff's contract, and the record is replete with disagreements between the two over plaintiff's performance as Superintendent. But the Court cannot say that a jury would behave unreasonably if it concluded that Samselski voted against plaintiff, and encouraged others to do so at least in part because plaintiff· is African–American. Plaintiff's shortcomings as Superintendent were not so noticeable and egregious that it would be impossible for a jury "to conclude that the defendant would not have tolerated them from any employee regardless of their [race]." *Cartagena,* 995 F.Supp. at 464. If the jury concluded that Samselski made the racially tinged remarks alleged by plaintiff, it would have a more than sufficient basis to find in her favor.

In *Cartagena,* plaintiff, alleged that he had been terminated from his job because of his national origin (Puerto Rican). To support his discrimination claims, plaintiff relied primarily upon an alleged series of national origin epithets made by his supervisor in the months preceding his discharge. On its motion for summary judgment, defendant asserted that the alleged remarks were never made and that plaintiff was fired because of poor work performance and his unwillingness to change shifts as requested by his supervisor. The Court denied the defendant's motion, finding that the supervisor's alleged comments, if made, were "the kind of remarks by a decisionmaker reflecting discriminatory animus." *Id.* at 463. They were not "stray" remarks directed at others; they

were directed at plaintiff and reflected on his work skills. "If said, a reasonable jury could believe that these remarks 'directly reflect[ ] the alleged discriminatory attitude' " on the part of the decisionmaker. *Id.* (quoting *Raskin,* 125 F.3d at 60–61).

Jamieson's claims against Samselski are quite similar to the claims in *Cartagena.* Although plaintiff will have to prove that Samselski made the alleged racially biased statements to plaintiff, and that these statements reflected a discriminatory animus that motivated Samselski to vote not to renew plaintiff's contract, plaintiff has more than sustained her burden on summary judgment.

### (3) *Samselski's Immunity*

Samselski argues that plaintiff cannot maintain a claim pursuant to § 1983 against her in her official capacity as a School Board member. She is correct.

■ It is well established that the Second Circuit has held that there is no cause of action for damages under § 1983 for damages against a School Board or its members in their official capacities. *See Mazza v. The Hendrick Hudson Central School District,* 942 F.Supp. 187, 191 (S.D.N.Y.1996) (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)); *see also Gentile v. Wallen,* 562 F.2d 193, 195 (2d Cir.1977). Accordingly, plaintiff cannot maintain a § 1983 claim against Samselski in her official capacity.

Samselski also argues that she is entitled to qualified immunity in her individual capacity. Plaintiff contends that there genuine issues of fact that preclude such a finding.

■ "A school official is entitled to qualified immunity from a § 1983 action insofar as his conduct does not violate clearly established statutory or constitu-

tional rights of which a reasonable person would have known, or even where the rights were clearly established, if it was objectively reasonable to believe that his acts did not violate those rights." *Mazza*, 942 F.Supp. at 194; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir.1995); *Frank v. Relin*, 1 F.3d 1317, 1327–28 (2d Cir.1993), *cert. denied*, 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). A school official is entirely shielded from civil damages as long as she had a good faith belief that her actions were lawful. *Hill*, 45 F.3d at 663.

 Samselski argues that she acted in good faith in voting not to renew plaintiff's contract based on her belief that plaintiff was not adequately performing her job as Superintendent. This fact-intensive defense is best left for trial. The jury may credit plaintiff's version of events and conclude that Samselski's vote was motivated by racial animus. A decision motivated by racial animus, despite any other contributing motivations, violated clearly established law of which Samselski should have been aware. Although the Supreme Court has stressed that immunity issues should be decided at the earliest possible stage in litigation, *see Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001) (holding in an excessive force case that even when there is an issue of fact, summary judgment may still be granted if the official's mistake as to the facts or the law surrounding his constitutional violation was reasonable), the general rule remains that qualified immunity does not attach as a matter of law when the immunity turns on the resolution of disputed facts, and when the official knew or should have known that the al-

leged violation was unreasonable, *Weyant v. Okst*, 101 F.3d 845, 857–58 (2d Cir.1996).

Accordingly, Samselski's motion for summary judgment on plaintiff's § 1983 claim against her in her official capacity is granted, but is denied in her individual capacity.

### C. *Plaintiff's claims against Halley and Monaco*

(1) Halley's and Monaco's non-discriminatory reasons for not renewing plaintiff's contract

(a) Halley

 Halley contends that his reasons for not renewing the plaintiff's contract included her lack of a coherent or consistent disciplinary policy, the lack of improvement in standardized test scores and poor labor relations. Cohn Aff. Ex. L, Halley Dep. 51.

(b) Monaco

 Monaco argues that he had legitimate reasons for not renewing plaintiff's contract. He states that there were complaints by parents and teachers regarding plaintiff. Monaco Aff. ¶ 6, Ex. C.

Both Halley's and Monaco's reasons for voting against the renewal of plaintiff's employment contract meets their burden of production under the *McDonnell Douglas* test, and the burden now switches back to plaintiff.

(2) *Plaintiff has failed to elicit evidence tending to show that Halley's or Monaco's non-discriminatory reasons were pretextual*

While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff. *See id.* at 253, 101 S.Ct. 1089; *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct.

2742. To raise a genuine issue of material fact that defendants' proffered reasons for discharging plaintiff were pretextual, plaintiff must introduce direct or circumstantial evidence tending to show that defendants' reasons for their votes were false, and it was more likely that they voted not to renew plaintiff's contract because she was African–American. *Gallo*, 22 F.3d at 1226; *Fullerton*, 2000 WL 1810099, at *7.

The record is devoid of any direct or circumstantial evidence of discriminatory animus expressed by either Halley or Monaco.

Plaintiff testified at deposition that there were three instances where Halley acted in a racially discriminatory manner: (1) when he indicated to a local newspaper that plaintiff was not a good role model; (2) when he opposed plaintiff's proposed biofeedback program in the school; and, (3) when he voiced disapproval over disciplinary action taken by plaintiff in the school. Cohn Aff. Ex. D; Jamieson Dep. 368. Halley argues that no inference of racially discriminatory animus could be drawn from these alleged instances. This Court agrees.

The first alleged act involved Halley's comments to a local newspaper where he said that plaintiff's actions in not disclosing to the Board that the person she proposed for a voluntary position within the school system was her husband were "a very clear conflict of interest," and that her actions didn't "set a good example for students in the District as to how a public official should conduct himself or herself." Watkins Aff. ¶ 4, Ex. 3; Jamieson Dep. 323–324. Plaintiff contends that this public embarrassment of her by Halley was racially motivated. There is, however, no evidence giving rise to such an inference. A rational trier of fact cannot infer racial animus from the fact that Halley criticized plaintiff. Moreover, when the incoming Mayor of New York City can be pilloried in the press for violating city rules for offering his sister and daughter virtually voluntary positions in his new administration, it cannot be said that Halley was not rasing a legitimate conflict of interest issue.[2]

The second alleged act of racism involved Halley's vocal opposition to a proposed biofeedback program for the students that was intended to help the children develop internal controls rather than controlling them through punishment. Cohn Aff. Ex. F; Jamieson Dep. 9. At a meeting, this program was presented to the Board by outside consultants and supported by plaintiff. Halley did not support the program and voiced his opposition at a board meeting. At one point, he made a comment about the credibility of the outside consultants and allegedly said that they weren't reputable and that plaintiff was responsible for bringing them to the meeting. Jamieson Dep. 374–375. Plaintiff asserts that the outside consultants were Latino, and Halley's comment about their reputability was racist against her as an African–American. *Id.* Halley argues that

---

**2.** Mayor Bloomberg was forced to get a waiver from an anti-nepotism rule from the City's Conflicts of Interest Board so that his daughter, a graduate of Princeton University, and his sister, could accept jobs in the administration, even though they would receive only a nominal $1 per year in salary. *See* Associated Press, *"NYC Mayor Appoints Sister, Daughter," Associated Press Online*, Feb. 1, 2002, *available at* 2002 WL 11686673. Prior to the waiver, the Mayor's choice to appoint his family members to these virtually volunteer positions attracted some criticism from the press. *See, e.g.,* Kirsten Danis & Susan Edelman, *"No Nepotism Allowed, Bloomy," New York Post*, Jan. 4, 2002, at 5, *available at* 2002 WL 4909023.

he did not even know that the presenters were Latino, Halley Aff. ¶ 24, and irregardless, that he was only voicing his opinion of the program and the presenters. Again, this Court fails to see how even an inference of discriminatory animus could be inferred from Halley's completely race-neutral comments about a controversial program.

The third alleged act of racial discrimination involved Halley's criticism of the plaintiff's disciplinary actions against the students of the school district. Plaintiff contends that Halley believed she was too lenient, and that his criticism was racist because the students being disciplined were African–American. Jamieson Dep. 357–358. She does not, however, point to any statement he made on the subject that had any racial content. He contends that he merely disagreed with the way plaintiff administered discipline and that there was nothing racial about it. Indeed, Halley argues that he had no way of knowing the race, or even the names of the students being disciplined because the superintendent reports given to the Board do not provide this information. Halley Aff. Ex. C. Plaintiff does not dispute this assertion.

There is a pattern to plaintiff's allegations against Halley. In each case, she proposed something new or controversial; in each case he disagreed with her approach. If a member of a protected class could raise a genuine issue of fact simply by pointing to policy differences with it, it would be virtually impossible to grant summary judgment in any case. It is not the law, however, that policy disagreements give rise to inferences of discrimination just because people of different races are on either side of the question. More is required to show discrimination. *See Bickerstaff*, 196 F.3d at 452 (Circuit court refused to make a leap from the chair of the Education Committee's vehement and vocal opposition to plaintiff's candidacy for promotion to an inference of racial prejudice necessary in order to defeat defendant's motion for summary judgment).

Plaintiff does not allege that Monaco ever expressed any racial animus whatsoever, in his words or in his actions, towards plaintiff or toward anybody else in relation to plaintiff. She simply concludes from the fact of his vote that he must have been racially prejudiced. No rational trier of fact could make such an inferential leap. *Id.*

Plaintiff also fails to provide sufficient circumstantial evidence of either Halley's or Monaco's discriminatory intent. Plaintiff alleges that Halley and Monaco were in a "voting block" with Samselski, and this, in conjunction with the fact that they voted against her contract renewal along with Samselski, could convince a rational jury that they voted against plaintiff because she was African–American. This argument fails. Often, but not always, Halley and Monaco voted for and against the same proposals as Samselski. What does this prove? It proves that all three agreed on many of the same issues in the District. It might tend to prove that the three of them even agreed that they no longer wanted plaintiff to be Superintendent and colluded to vote against her. No reasonable juror, however, could infer racial animus on the part of Halley and Monaco simply because their votes coincided with those of Samselski, against whom concrete allegations of racial animus have been raised. Plaintiff submits no evidence tending to show that either Halley's or Monaco's decision was dictated or influenced by Samselski's views. We do not countenance guilt by association; plaintiff asks the trier of fact to infer too much. Plaintiff's failure to adduce evidence of discriminatory animus as against Halley or Monaco is fatal to her claim against them.

#### 4. *The Action Against the District*

The defendant School District argues that plaintiff's claims against the District must be dismissed because she has not pled an official policy or custom by the District which led to the decision not to renew her contract. Not only has Jamieson not pled such a claim, the District argues, she cannot demonstrate the existence of a policy or practice which led to the Board's decision not to renew her contract. *See Monell v. Dep't of Social Svcs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff argues that she has established the District's liability because a municipality is liable under § 1983 where the actions complained of were undertaken by a municipal policymaker, and Samselski was a municipal policymaker. *See Annis v. County of Westchester,* 136 F.3d 239, 248 (2d Cir. 1998) (citing *Pembaur v. Cincinnati,* 475 U.S. 469, 481–85, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

 Plaintiff need not establish an official policy or custom of the District if the trier of fact finds there has been a decision by a municipal policymaker who possesses final authority to establish municipal policy with respect to the action ordered. *Pembaur,* 475 U.S. at 481–82, 106 S.Ct. 1292. Plaintiff does successfully plead such a claim. In her Complaint, she alleges: "Defendants represent the policymakers for the Poughkeepsie School District and the actions set forth herein represent the policy of that defendant for purposes of 42 U.S.C. § 1983." Complaint ¶ 41. Pursuant to the New York State Education Law, the Board of Education has final policymaking authority for the District, including with respect to the Superintendent's employment. *See* N.Y. Educ. Law § 2507 ("The superintendent and any associate superintendent of schools in each school district shall hold his

position subject to the pleasure of the board of education....").

In order to survive this motion for summary judgment, plaintiff must show that Samselski was a "decisionmaker." *See Knight v. Connecticut Dep't of Public Health,* 275 F.3d 156, 166 (2d Cir.2001) (plaintiff must prove that the *decisionmakers* in her case acted with discriminatory purpose); *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (same).

 In voting on the renewal of plaintiff's contract, the School Board, as a whole, had the sole decisionmaking authority. Thus, Samselski is a decisionmaker even though she is only one of five Board members who voted on the renewal of plaintiff's contract. Moreover, the impermissible bias of a single individual can infect the entire group of collective decisionmakers. *See Price Waterhouse,* 490 U.S. at 256, 109 S.Ct. 1775 (group decision was biased when made in reliance on the biased comments of some of defendant firm's partners); (*Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir.1999); *Rosen v. Thornburgh,* 928 F.2d 528, 534 (2d Cir.1991); *Jalal v. Columbia Univ.,* 4 F.Supp.2d 224, 238 (S.D.N.Y.1998)); *see also Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) (if a committee "acted as the conduit of a [supervisor's] prejudice—his cat's paw—the innocence of its members would not spare the company from liability").

Although this court makes no merit-based findings, a reasonable jury could find that Samselski's alleged bias infected the overall decisionmaking process, even if she did not use racial animus to convince her fellow Board members to oust plaintiff. Samselski told plaintiff in August 1998 that she had the votes to oust her. A rational jury could find that Samselski had already solicited Halley and Monaco's agreement

to vote against plaintiff. Her influence over these two Board members—even if she used legitimate reasons to convince them to vote against plaintiff—could support a finding of impermissible discrimination, as long as her behavior was discriminatory.

Defendant Samselski was a policymaker as a member of the Board, and the Board possessed final authority over the Superintendent's employment contract. If Samselski is found by a trier of fact to have exercised the requisite amount of authority to influence the policy of the Board with respect to plaintiff's contract renewal, then she would be a policymaker, and the District could be found liable by a reasonable jury. Because there is a genuine issue of material fact, summary judgment for the District is improper.

### CONCLUSION

The Poughkeepsie City School District and Paul Monaco's motion for summary judgment is GRANTED as to all claims against Monaco and as to the state law claims against Monaco and the District, and DENIED as to the federal claims against the District.

Thomas Halley's motion for summary judgment is GRANTED.

Geraldine Samselski's motion for summary judgment is GRANTED as to the state law claims against her and as to the federal claims against her in her official capacity, and DENIED as to the federal claims against her in her individual capacity.

This constitutes the decision and order of this Court.