06-1718-cv
Cine SK8, Inc. v. Town of Henrietta

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 8, 2007                    Decided: November 8, 2007)

Docket No. 06-1718-cv

_____

CINE SK8, INC., DOING BUSINESS AS FUN QUEST, DOUGLAS J.
LUSTIG, AS TRUSTEE AND ROSS CATALANO,

*Plaintiffs-Appellants*,

v.

TOWN OF HENRIETTA, JAMES R. BREESE, INDIVIDUALLY AND AS
SUPERVISOR OF THE TOWN OF HENRIETTA AND CHRIS ROTH,
INDIVIDUALLY AND AS TOWN OF HENRIETTA FIRE MARSHALL,

*Defendants-Appellees*.

_____

Before: FEINBERG, CALABRESI, and WESLEY, *Circuit Judges*.

_____

Appeal from the March 31, 2006, judgment of the United States District Court for the Western District of New York (Feldman, *Magistrate Judge*), granting defendants summary judgment.

Affirmed in part, vacated in part and remanded in part.

_____

Jeffrey Wicks, Law Office of Jeffrey Wicks, Rochester, NY, *for Plaintiffs-Appellants*.

Anthony M. Sortino, Gallo & Iacovangelo, LLP, Rochester, NY, *for Defendants-Appellees*.

_____

CALABRESI, *Circuit Judge*:

Plaintiff Cine SK8, doing business as Fun Quest, received from defendant Town of Henrietta, New York, a special use permit to operate a dance club for teenagers at a recreation center it planned to open on the site of a former retail store. After an overcrowding incident at the recreation center, the Henrietta Town Board amended the permit to prevent Fun Quest from holding dances for teenagers. Plaintiffs filed suit alleging, inter alia, that the permit was amended because of the Town Board's objection to the racial composition of Fun Quest's clientele and, as such, the amendment deprived plaintiffs of their substantive due process rights, violated their rights under the Equal Protection Clause, and involved a conspiracy to deny equal protection in violation of 42 U.S.C. § 1985.

Because plaintiffs proffered evidence that raises genuine issues of material fact as to (1) whether they had a property interest in the original special use permit and (2) whether defendants infringed on that property right in an arbitrary or irrational manner by acting on the basis of racial animus or through a process tainted with fundamental procedural irregularities, we hold that the district court erred in granting defendants summary judgment on the substantive due process claim. But we conclude that the district court properly awarded defendants summary judgment on plaintiffs' equal protection and conspiracy claims. Accordingly, we affirm the district court's judgment in part, vacate it in part, and remand the case for further proceedings consistent with this opinion.

2

**I. Underlying Events**

In September 2001, plaintiff Cine SK8, Inc., operating as Fun Quest, entered into a ten-year lease for an existing building which had previously housed a Caldor's store in Henrietta, New York, a suburb of Rochester. Plaintiff Ross Catalano, together with his wife and his partner, James Drew, signed the lease in their personal capacities and, as a result, were personally liable for the $577,500 annual rent.

The Henrietta Town Board ("Town Board" or "Board") had earlier approved a special use permit sought by Fun Quest that allowed it to convert the Caldor property into a family roller sports and recreation center, including a teen dance club, an indoor skate park, a roller skating rink, a snack bar, and a gymnastics room. A portion of the space was to be converted into a craft and antique co-op named "World Treasures."

After the Town Board's approval of the special use permit, Fun Quest entered into agreements with several building contractors to construct leasehold improvements. The total cost of the demolitions and improvements was $2.3 million. After construction was complete, Fun Quest obtained a certificate of occupancy that set the occupancy limit for the entertainment center at 1,520 people. Fun Quest opened for business on January 3, 2002. During the first two months of operation, business steadily grew to the point where approximately 600 teenagers per night patronized Fun Quest.

The first events that led to the current lawsuit took place on Saturday, March 9, 2002. At approximately 9 p.m. that evening, a large number of young people arrived at Fun Quest.

Plaintiffs claim that the unusually sizeable influx of teenagers occurred because a movie theater, located about a mile away from Fun Quest, lost power and a significant part of the theater's displaced customers came to Fun Quest. Due to the inclement weather, many of the new arrivals crowded into the front foyer of Fun Quest. There were approximately 15 to 20 Fun Quest security personnel on duty. The security officials apparently became concerned about the situation and called 911 in order to obtain backup for crowd control. At around the same time, Henrietta Fire Battalion Chief James Comstock, who was off duty and at Fun Quest with his son, called the fire dispatcher to request that the Fire Marshall come to the entertainment center to deal with the crowds.

When Fire Marshall Chris Roth, a defendant, arrived at Fun Quest, he saw many, many people trying to go into the building and he had difficulty getting inside. He stated that when he finally entered, he observed a "large dense crowd" and that, when he tried to ascertain the number of people inside Fun Quest from the security guards posted at the doors, the security officials were unable to give him that information. Roth took photographs of the scene and, on the basis of what he witnessed, ordered Fun Quest to be evacuated and closed for the evening.

Although plaintiffs claim that the number of people inside Fun Quest did not exceed the occupancy limits (a fact not contested by Roth), they do not dispute that there were approximately two to three thousand people outside Fun Quest trying to get in at the time of the evacuation, nor do they dispute that the situation presented crowd control concerns that required immediate attention. Forty-one police cars responded to the scene and assisted with the evacuation and crowd control efforts.

On Monday, March 11, 2002, Town Supervisor James Breese, also a defendant, met with Roth to review Roth's report of the incident and the pictures Roth had taken. After meeting with Roth, Breese sent a letter to Ross Catalano, Fun Quest's president, asking that Fun Quest immediately discontinue teen dances. The letter read:

> Certainly we all regret the unfortunate incident which occurred at FunQuest[1] last Saturday night. It is a "black eye" for everyone. It must be addressed at once.
>
> "Teen Dances" do not have a good record of success in this general area, especially when they are open-ended as to whom [sic] can attend and who can't. Inevitably there are problems.
>
> *I have been told that your marketing efforts to draw crowds to this event included radio commercials – targeting teens who live within the city limits to come to Henrietta for a good time. Well, they certainly came didn't they? I saw the pictures.*
>
> Ross, we want FunQuest to be a success but not "at any price." What happened Saturday is totally unacceptable. Our constituents have made it clear that they want firm action taken now.
>
> In discussions today with Town Board members it is clear that there is a strong consensus that you immediately *discontinue your "teen dances"* until further notice. As you know you have a special use permit which can be revoked or amended.
>
> I am sorry it has reached this point but we have little choice in the matter: it[']s about public safety.

(first emphasis added). The letter was also sent to the other members of the Town Board (as Town Supervisor, Breese was a voting member and the leader of the Board).

---

[1] In the documents submitted in this case, the "Fun Quest" name is sometimes represented as two words and other times as one word. Because the official caption uses the two-word version, we do so as well except where the name appears as one word in quotations.

The following day, a meeting took place at the Town Hall to discuss the events of March 9. The attendees included Town Supervisor Breese; Fire Marshall Roth; Fun Quest President Catalano; James Drew, an officer and shareholder of Fun Quest; William J. Mulligan, Jr., a member of the Town Council; Todd Myers, an official with Business Protection Specialists, whom Fun Quest brought to the meeting to discuss proposals for increased security measures; and several others.

At the meeting, Town Supervisor Breese allegedly made racist statements with respect to Fun Quest's clientele. There are no minutes of the meeting and Breese denies making the comments. But the district court found that "numerous witnesses have testified that after drawing attention to photographs taken of the crowd gathered at Fun Quest on March 9, 2002, Breese stated in sum and substance: 'Look at these pictures. There is not a white face among them. I don't want these people in my town.'" Rochester media reported some of Breese's comments, which prompted Rochester Mayor William Johnson to issue a press release the next day in which he "expressed his distaste for statements made by Henrietta Town Supervisor James Breese in connection with an incident at FunQuest last Saturday."

On March 14, the day after the Rochester mayor issued his statement, Breese distributed a press release, in which he asserted:

> The Town of Henrietta's position on FunQuest is simple and straightforward and unrelated to race . . . .
>
> Efforts by the FunQuest operators and others to introduce racial issues as the reason for the Town's actions are irresponsible and without substance. . . .
>
> Henrietta is an open and diverse town with a large minority population. As Supervisor for 17 years I like to think I have played an important part in all that by

6

supporting affordable housing and providing Recreation Department programs which encourage diversity. The record shows that I am not racist in any way – I find it outrageous and offensive that such charges were made by people who don't even know me.

At a regular meeting of the Town Board held on March 20, 2002, the Board discussed and received public comments about security measures at Fun Quest, including allegations that Fun Quest did not implement a "membership" system for its teen dances as it had promised the Board it would do when it applied for the special use permit. The Board passed a resolution calling for a public hearing "to consider the revocation or amendment" of the special use permit in light of concerns regarding Fun Quest's compliance with "written and oral commitments it made as part of its [Special Use Permit] Application" including "teen dance membership, security, and maximum occupancy limits."

The hearing took place on April 3, 2002. Fun Quest presented the testimony of two security experts that it had hired after the March 9 incident to review its security plans and recommend improvements, as well as a written report prepared by the experts that detailed the new security procedures that Fun Quest had adopted. But, at the time of the hearing, Fun Quest had filed for bankruptcy and some Town Board members and the Town attorney vocalized concerns about Fun Quest's ability to pay for the added security measures. Town Board members made two other comments of note during the hearing. Town Board Member Catherine McCabe stated "a question was made about the need for teen dances in the area. Well, our Rush-Henrietta School District has dances for school children, and they do hold them on a regular basis for the school children in the particular schools that they have." At a different point in the hearing, Town Board Member Michael Yudelson, following up on comments offered by a

7

hearing attendee regarding the racist statements Breese had allegedly made at the previous meeting, said:

> We were really talking about the things that happened there and the race issue, which was brought up as a smoke screen, it's not really pertinent, but since it was brought up I do want to acknowledge and thank Reverend Goff from the NAACP for coming out and meeting with our Town Supervisor and public[ly] stating after the meeting that he found that race was not an issue in this situation.

Overall, the public hearing was quite contentious. The district court observed that "[t]he hearing transcript reveals a sometimes raucous public hearing with occasional shouting and verbal confrontations as residents, employees of Fun Quest and members of the Town Board spoke on whether Fun Quest's special use permit should be amended to forbid 'teen dances' from being held."

At the end of the public hearing, a resolution to amend Fun Quest's special use permit to exclude teen dancing as a permitted use was introduced. The resolution – made on the motion of Town Board Member Mulligan and seconded by Town Board Member McCabe – had been prepared in advance of the hearing. It offered several reasons for the amendment, including that (1) Fun Quest had not honored commitments it had made regarding admissions and security for teen dances; (2) Fun Quest had "failed to cooperate with the Town's reasonable request that teen dancing be suspended pending this Hearing"; (3) Fun Quest operators "have made false and inflammatory statements about Town Officials, including the Supervisor, in an effort to mislead the public, thereby undermining their credibility"; (4) apparent financial difficulties unrelated to the teen dances would "make it difficult for FunQuest to effectively implement an acceptable security plan"; and (5) "the Town Board takes very seriously any matters which may negatively

8

impact public safety and young people, and it must take steps to ensure that what happened on March 9, 2002 is not repeated." The Board's five members, which included Breese, voted unanimously to adopt the resolution amending the special use permit.

Plaintiff Catalano alleges that the ban on teen dances "financially crippled" Fun Quest, as teen dances accounted for approximately 50 percent of Fun Quest's revenues. He further contends that the amendment ultimately caused Fun Quest to close and resulted in his personal bankruptcy, as well as Fun Quest's corporate bankruptcy.

**II. Litigation Before the District Court**

Plaintiffs – Cine SK8, Catalano, and Douglas Lustig, a bankruptcy trustee – filed a complaint against defendants Town of Henrietta, Town Supervisor Breese, and Fire Marshall Roth asserting what plaintiffs identified as six separate causes of action: (1) denial of substantive due process; (2) denial of equal protection; (3) conspiracy to deny equal protection pursuant to 42 U.S.C. § 1985; (4) violation of civil rights pursuant to 42 U.S.C. § 1983; (5) tortious interference with business relations; and (6) deliberate infliction of severe emotional distress. Defendants moved for summary judgment.

Magistrate Judge Jonathan Feldman granted defendants' motion for summary judgment as to the federal claims.[2] With respect to the substantive due process cause of action, the district court did not resolve whether plaintiffs had a valid property interest in the special use permit. Rather, it found that, although "plaintiffs have brought forth credible evidence of racial animus

---

[2] The parties had consented to having a magistrate judge resolve all dispositive matters pursuant to 28 U.S.C. § 636(c).

9

by Town Supervisor Breese," such a showing was insufficient to establish that the Town Board had acted arbitrarily or irrationally.

As to plaintiffs' equal protection argument, the district court interpreted it as a claim of selective enforcement. The court found that plaintiffs failed to show that they were treated differently from others who were similarly situated and, as a result, did not satisfy the requirements of a selective enforcement cause of action. Because the district court found that plaintiffs did not present a viable substantive due process or equal protection claim, it granted summary judgment as to the § 1983 cause of action as well. The district court found the § 1985 conspiracy claim failed because there was no evidence of a conspiracy among the members of the Henrietta Town Board or that the Board's actions were motivated by racial animus. Finally, the district court dismissed the state law claims without prejudice.

## ANALYSIS

### I. Substantive Due Process Claim

Plaintiffs' first argument is that defendants violated their substantive due process rights when the Town Board amended the special use permit to preclude Fun Quest from holding teen dances. To prevail on this cause of action, plaintiffs must show that (1) Fun Quest had a valid property interest in the special use permit as it was originally granted and that (2) defendants infringed on that property right in an arbitrary or irrational manner. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). Because plaintiffs proffered evidence that raises genuine issues of fact as to whether they satisfy each of the criteria, we hold that the district court erred in granting defendants' motion for summary judgment on this claim.

10

*A. Property Interest*

The Second Circuit uses a "strict entitlement test to determine whether a party's interest in land-use regulation is protectible under the Fourteenth Amendment." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (internal quotation marks omitted) (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994)). The entitlement test applies to claims – such as the one raised here – involving a local government's revocation of a land-use benefit that the plaintiffs had previously been granted. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998). Because the U.S. Constitution generally does not create property interests, this court, in applying the entitlement test, looks to "existing rules or understandings that stem from an independent source such as state law to determine whether a claimed property right rises to the level of a right entitled to protection under the substantive due process doctrine." *Id*. (internal quotation marks omitted) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 212 (2d Cir. 1988) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972))). Accordingly, in this case, we must turn to New York law to determine whether plaintiffs have a protectible property right.

Under New York law, a property owner has no right to an existing land-use benefit unless that right has "vested." "In New York, a vested right can be acquired when, pursuant to a legally issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development." *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 47 (1996). In order to gain the vested right, "[t]he landowner's actions relying on a valid permit must be so substantial that the

11

municipal action results in serious loss rendering the improvements essentially valueless." *Id.* at 47-48; *see also Sterngass v. Town Bd. of Clarkstown*, 10 A.D.3d 402, 405 (2d Dep't 2004); *cf. DLC Mgmt. Corp.*, 163 F.3d at 130-31 (recognizing that, under New York law, a property owner can gain a property right in the former zoning status of his land when that right vests as a result of the owner having made substantial expenditures and undertaken substantial construction prior to the enactment of the more restrictive zoning ordinance).

Here, plaintiffs obtained a valid permit to hold teen dances at the former Caldor building and, in reliance on that permit, made $2.3 million worth of improvements to transform the property from a retail store into a family entertainment center. Plaintiffs allege that when the Town Board amended the special use permit, it "disrupted cash flow in this fledgling business to such an extent that Plaintiffs suffered a serious loss which in effect rendered their improvements to the property valueless." The business, and Catalano personally, went into bankruptcy following the amendment of the permit. Given these considerations, we believe that plaintiffs have proffered enough evidence so that, unless their evidence is effectively countered, they have established, under New York law, that they had a vested property right in the original special use permit. At the very least, there exists a genuine issue of fact as to whether they had such a right, making summary judgment on this ground inappropriate.

*B. Arbitrariness or Irrationality of the Amendment of the Special Use Permit*

But having a cognizable property right is not enough. In order to prevail on their substantive due process claim, plaintiffs must also show that defendants infringed their property right in an arbitrary or irrational manner. *See Harlen Assocs.*, 273 F.3d at 503; *Natale v. Town of*

12

*Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999) ("For state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'"(internal citation omitted)). In *Natale*, this court recognized that conduct that would rise to this standard included a "planning dispute . . . tainted with . . . racial animus" or "fundamental procedural irregularity." 170 F.3d at 262. The record here demonstrates that there is at least a genuine issue of fact as to whether the process by which the Town Board amended the special use permit was tainted in one or both of these respects.

i. *Racial Animus*

The district court found that plaintiffs had failed to offer any evidence that the Town Board's decision was based on, or infected by, racial animus. It acknowledged the "credible evidence" plaintiffs had offered of Town Supervisor Breese's impermissible motivations, but found "there is simply nothing in the record to suggest that Breese's racial animus infected or tainted the other four members of the Town Board who voted in favor of amending the special use permit." In support of this conclusion, the magistrate judge cited two Eleventh Circuit cases which held that evidence of the improper motive of one member of, respectively, a nine-member public body and a twelve-member public body was an insufficient basis for finding the municipality liable for the public body's actions. *See Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006); *Dixon v. Burke County*, 303 F.3d 1271, 1276 (11th Cir. 2002).[3]

---

[3] The magistrate judge also cited a decision from the Western District of New York. *Gupta v. Town of Brighton*, 9 F. Supp. 2d 242, 246 (W.D.N.Y. 1998).

13

The magistrate judge's holding on this point was flawed. As an initial matter, our court, unlike the Eleventh Circuit, has never adopted the rule that a plaintiff must demonstrate that a majority of a public body acted with racial animus or in an otherwise unconstitutional manner in order for that plaintiff to hold the municipality liable for constitutional violations. Rather, we have held only that if a defendant public body (or its members) *proves* that, despite the unconstitutional actions of a minority, a majority based their actions on legitimate grounds, it, or its individual members, may prevail. *See Coogan v. Smyers*, 134 F.3d 479, 485-86 (2d Cir. 1998); *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995).

There is an obvious difference between the two standards – a difference that, in our view, is critical given the ease with which public officials motivated by racial animus or other unconstitutional purposes can hide their true intentions and thereby prevent injured parties from obtaining the redress to which they are entitled. As the First Circuit aptly explained, "because discriminatory animus is insidious and a clever pretext can be hard to unmask . . . it may be overly mechanistic to hold [a plaintiff] to strict proof of the subjective intentions of a numerical majority of council members." *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (recognizing that "[p]roving the motivation behind official action is often a problematic undertaking" when the action is undertaken by a multi-member government body).

And, as we have acknowledged in other contexts that involve groups of people combining to make an allegedly discriminatory decision, it is possible that, even if a majority of the individuals that participate in the decision lack unconstitutional motives, the unconstitutional

14

intentions of a minority of those involved can taint the ultimate outcome. *See, e.g.*, *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) ("[I]t is clear that impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . [] even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." (omissions in original) (internal quotation marks omitted)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 579-80 (1985) (citing the pretextual explanations of two members of a five-member committee in upholding the reasonableness of the district court's determination that the committee, which had been appointed by the mayor, engaged in discrimination when it rejected the application of a Title VII plaintiff).

Given these considerations, we believe that in appropriate circumstances a plaintiff seeking to hold a municipality or public officials liable based on the actions of a public body may prevail – and, at the very least, should survive summary judgment – even when the plaintiff has not presented evidence that a majority of the individual members of that body acted with unconstitutional motives. In our view, even if a plaintiff does not demonstrate directly that a majority of a public body acted with unconstitutional motives, he should be permitted to take his case to trial if he proffers evidence that strongly indicates that discrimination was a significant reason for a public body's actions and the defendant body, or its members, fails to counter that evidence with its own clear evidence that a majority acted with permissible motives.[4]

---

[4] The analysis contained in *Jamieson v. Poughkeepsie City School District*, 195 F. Supp. 2d 457 (S.D.N.Y. 2002), is instructive on this point. In *Jamieson*, the court denied a school district's motion for summary judgment where the plaintiff offered evidence that one member of a five-member school board acted with racial animus, but did not proffer evidence relating to the motivations of the other board members. The court explained, "the impermissible bias of a

15

We need not definitively resolve this issue here, however, because plaintiffs, in fact, *did* offer evidence that at least raises a genuine issue of fact as to whether a majority of the Board acted with racial animus in voting to amend the special use permit. Three Board members – Breese, Mulligan, and McCabe – each made comments which would permit a reasonable jury to conclude that they acted on the basis of impermissible racial considerations when they voted to modify the special use permit.

The potentially problematic comments at issue here often took the form of Town Board members expressing concern that too many "city kids" – as opposed to the children of Henrietta – came to Fun Quest. In order to appreciate the racial connotations of such remarks, it is necessary for these comments to be placed in the context of the relationship between Henrietta and the city that is being referred to, Rochester. Henrietta is a suburb of Rochester, with approximately 39,000 residents; Rochester has approximately 220,000 residents. According to the most recent census data, Henrietta's population is approximately 84 percent white and 7 percent African American. Rochester's population is approximately 48 percent white and 38.5 percent African American.[5] From the record, we conclude that a jury could readily find that the term "city kids" was used by Town Board members as a euphemism for African-American teenagers from Rochester.

single individual can infect the entire group of collective decisionmakers. . . . [A] reasonable jury could find that [single board member's] alleged bias infected the overall decisionmaking process, even if she did not use racial animus to convince her fellow Board members to oust plaintiff. . . . Her influence over [] two Board members – even if she used legitimate reasons to convince them to vote against plaintiff – could support a finding of impermissible discrimination, as long as her behavior was discriminatory." *Id*. at 474-75 (internal citation omitted).

[5] *See* Henrietta, New York Fact Sheet, http://factfinder.census.gov/ (last visited Oct. 2, 2007); Rochester, New York Fact Sheet, http://factfinder.census.gov/ (last visited Oct. 2, 2007).

16

It was in this context that many of the Town Board members' troubling comments took place. On March 11, 2002, the Monday following the incident, Town Supervisor Breese sent Catalano a letter which stated, "I have been told that your marketing efforts to draw crowds to this event included radio commercials – *targeting teens who live within the city limits* to come to Henrietta for a good time. Well, they certainly came didn't they? I saw the pictures." (emphasis added). The pictures cited by Breese referred to photographs that Fire Marshall Roth had taken during the March 9 incident at Fun Quest. At the meeting on March 12 attended by Breese, Town Board Member Mulligan, Catalano, and others, Breese, after drawing the attendees' attention to the photos, stated, according to the testimony of others at the meeting, "Look at these pictures. There is not a white face among them. I don't want these people in my town." Catalano testified that after Breese made that comment, Catalano stated that a substantial portion of Henrietta's population was African-American but Breese responded the figure was "only three percent."

Town Board Member Mulligan also testified that Henrietta's racial demographics and makeup were discussed at the March 12 meeting. Mulligan further testified that, like Breese, Mulligan believed, on the basis of Roth's pictures, that "radio advertising resulted in a preponderance of City kids winding up at the dance." When asked how he reached that conclusion, Mulligan said that "as I stated before, you know, Henrietta is about 10 percent minority, and these pictures are 99 percent minority. So you would conclude that it was, you know, heavily attended by City residents."

Yet another member of the Town Board also made comments that – in the particular context – could lead a jury properly to find that racial animus animated her support of the

17

amendment of the special use permit. At the April 3, 2002 hearing at which the amendment was approved, Town Board Member McCabe stated that she saw no need to have a facility that offers teen dances because such dances were already provided by the Town's school system *for the students that lived in the Town.* McCabe stated, "[A] question was made about the need for teen dances in the area. Well, our Rush-Henrietta School District has dances for school children, and they do hold them on a regular basis *for the school children in the particular schools they have.* So, there is availability for children to dance." One possible implication a fact-finder could reasonably draw from these comments is that McCabe favored dances not open to "city" – that is, African American – teenagers but that were instead limited to "Town" – i.e., predominantly white – children.

In light of this evidence regarding a majority of the Town Board, plaintiffs have sufficiently raised a genuine issue of material fact as to whether the Town's amendment of the special use permit was tainted by racial animus and hence was irrational.[6] This is so because when this court reviews a district court's grant of summary judgment, it "view[s] the evidence in the light most favorable to the party opposing summary judgment, . . . draw[ing] all reasonable inferences in favor of that party," *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004), and because "[i]t is well [] settled that in ruling on a motion for summary judgment, a judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence

_____

[6] This is especially so, given the significant fact that the resolution to amend the special use permit to prevent Fun Quest from holding teen dances was drafted and introduced by Town Board Member Mulligan and seconded by Town Board Member McCabe.

18

presented," *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 298 (2d. Cir. 1996) (second alteration in original).

The Fun Quest plaintiffs have met this threshold. The evidence they have offered for their substantive due process claim is not mere "conjecture and speculation." *Contra Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999). Rather, it relies on the comments of Supervisor Breese, Town Board Member Mulligan, and Town Board Member McCabe which are in the record presented to the district court. Based on these statements, a jury could draw the reasonable inference that the Town Board amended the special use permit in part because of a majority of its members' race-based hostility to Fun Quest's clientele and that the other legitimate and non-discriminatory reasons they cited were either pretextual or not independently determinative – in other words, that the amendment was "tainted with . . . racial animus." *Natale*, 170 F.3d at 262. A jury could, of course, reach a different conclusion, and find that the Town Board acted solely on the basis of the permissible motivations claimed by defendants – e.g., concern for public safety or plaintiffs' financial circumstances – and that these justifications were not pretexts for unconstitutional behavior. But, in light of the evidence proffered by plaintiffs, this issue is a factual one for a jury to resolve at trial and not for a court to decide on summary judgment.

ii. *Fundamental Procedural Irregularity*

Even in the absence of the evidence of racial animus, the Board's actions were likely sufficiently arbitrary or irrational to preclude granting summary judgment to defendants. As we recognized in *Natale*, a planning dispute "tainted with fundamental procedural irregularity," like

19

one infected by racial animus, qualifies as arbitrary or irrational and hence as a violation of a plaintiff's substantive due process rights (provided it affects a valid property interest). 170 F.3d at 262. Here, the record demonstrates that there is at least a genuine issue as to whether such irregularity tainted the process by which plaintiffs' special use permit was amended.

Most significantly, it appears that, under the regulations that govern zoning for the Town, the Town Board lacked the power to amend the special use permit. Article XII of the Code of the Town of Henrietta (the "Code") provides the procedures relevant to special use permits. It allows the Board (or its designee) to approve, deny, suspend, or revoke a special use permit. Under the Code, suspension or revocation is required where the Board concludes, after a hearing, that the permittee committed a:

> knowing violation of any provision of federal, state and local law or ordinance relating to the conduct of business and the use or maintenance of the premises or the knowing failure to comply with all the notices, orders, decisions and rules and regulations made by the Town governing the occupation and use of the premises by the applicant or a duly authorized agent or employee of the applicant in charge of the use.

XII Code of the Town of Henrietta § 295-54(E). In addition, the Code allows the Board to issue a *new* special use permit to an individual whose special use permit has been revoked if, following a hearing, the Board determines that "the acts which led to the revocation will not occur again." *Id*. at § 295-54(H). By contrast, the Code makes no provision for the *amendment* of a special use permit in any circumstances.

In its resolution amending plaintiff's special use permit, the reasons the Town Board offered for its actions included (a) that Fun Quest had failed to fulfill the written and verbal commitments it had made to the Town Board with respect to security arrangements and with

20

respect to admissions policies for teen dances and (b) that Fun Quest did not cooperate with the Town Board's request that it suspend teen dances pending the hearing on the special use permit. Under the Code, these rationales might have justified the Board's revocation or suspension of Fun Quest's special use permit.[7] They do not, however, justify the actions that the Town Board took; specifically, the Code does not permit the Town Board to *amend* a special use permit for these reasons or for any other. And, as defendants' counsel conceded at oral argument, if the Town Board did not have authority for the actions it took regarding Fun Quest's permit – as it appears it did not – the Board's actions were ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation.

Moreover, even assuming *arguendo* that the Town Board's authority to *suspend* or *revoke* a special use permit encompassed the power to *amend* such a permit, the process the Town Board used to do so in this case seemingly failed to comply with the procedural requirements of the Code. The Code mandates that the Town Board provide notice and a hearing before it can suspend or revoke a special use permit. At such a hearing, the permittee is guaranteed certain procedural rights, including the right to cross-examine opposing witnesses. XII Code of the Town of Henrietta § 295-54(F,G). During the hearing to consider the proposed amendment to the Fun Quest special use permit, however, Fun Quest was given no opportunity to cross-examine any of the several audience members who made comments in support of altering the special use permit to exclude teen dances. Some of their statements involved quite incendiary accusations, including that knives had been found on the premises of Fun Quest, that drugs were

_____

[7] We note, however, the other reasons offered in the Town Board's resolution for the amendment of the special use permit do not, under the Code, appear to be valid bases for either a revocation or a suspension of a special use permit.

21

being used at Fun Quest, that Catalano had been the subject of criminal charges, and that Catalano had failed to pay creditors in earlier business ventures.

The Town Board's failure to allow Fun Quest to address these charges by cross-examining the individuals who made them, as required by the Town Code, was compounded by the Board's failure to offer Fun Quest the chance even to respond to the charges at the close of the public hearing. Nor, given one Board member's public comments suggesting that she accepted as fact the unrebutted accusations of misconduct by Fun Quest and its employees, can the severe shortcomings in the process used by the Town Board be dismissed as harmless. These flaws further demonstrate that there is at least a genuine issue as to whether the process by which the Town Board amended the special use permit was "tainted with fundamental procedural irregularity" and hence sufficiently arbitrary to rise to a substantive due process violation. *Natale*, 170 F.3d at 262.

iii. *Plaintiffs Are Entitled to Bring Their Substantive Due Process Claim to Trial*

Because plaintiffs presented evidence raising genuine issues of material fact as to (1) whether they had a property right in the original special use permit and (2) whether the Town Board's amendment of the permit was tainted by either (a) racial animus or (b) fundamental procedural irregularity – each of which independently, or in combination, would be sufficient to demonstrate that the Town Board's actions were arbitrary or irrational – we hold that the district court erred in granting defendants summary judgment on plaintiffs' substantive due process claim. Accordingly, we also hold that the district court erred in granting summary judgment on the § 1983 cause of action.

22

## II. Equal Protection Claim

The district court properly granted summary judgment to defendants on plaintiffs' equal protection claim. To prevail on this claim, which is based on a theory of selective enforcement, plaintiffs must show both (1) that Fun Quest was treated differently from other similarly situated businesses and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs.*, 273 F.3d at 499 (internal quotation marks omitted). Generally, whether two entities are similarly situated is a factual issue that should be submitted to the jury. *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). But this rule is not absolute and "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs.*, 273 F.3d at 499 n.2.

Plaintiffs alleged in their complaint that "upon information and belief, other businesses located in Henrietta such as the Regal Theater, [and] Red Lobster have had similar situations." But, following discovery, plaintiffs proffered no evidence that these businesses were indeed similarly situated in any material way. For instance, plaintiffs did not offer any evidence that the other businesses had a permit that allowed them to use their property for a special use. Nor did they offer any evidence that those businesses ever experienced overcrowding issues. Nor, finally, did they offer any evidence that Regal Theater or Red Lobster had a large clientele of teenagers who were white and that those businesses were treated differently because of the racial makeup of their customers. In other words, plaintiffs' claim that Regal Theater and Red Lobster were

23

similarly situated to Fun Quest is not based on evidence that gives rise to a genuine issue of material fact but rather on "sheer conjecture and speculation that is insufficient to withstand the Town's motion for summary judgment." *Lisa's Party City, Inc.*, 185 F.3d at 17 (internal quotation marks omitted).

**III. Conspiracy Claim**

In order to state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006). A § 1985(3) "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (internal quotation marks omitted).

Although we do not agree with the district court's rationale for granting defendants summary judgment on this claim, we nevertheless conclude that it ruled correctly. The district court awarded the defendants summary judgment on the conspiracy ground on two bases. First, it determined that, for the reasons given when it rejected plaintiffs' substantive due process claim, "there [was] no evidence that the Town Board's actions were motivated by racial animus." As explained above, the district court's conclusion on this point was erroneous. Accordingly, this rationale does not provide a basis for granting defendants summary judgment on plaintiffs' conspiracy claim.

24

Second, the district court found that "there [was] no evidence of a conspiracy among the members of the Henrietta Town Board." This characterization of the record is an exaggeration; a more accurate description is that the evidence offered by plaintiffs is insufficient to establish a genuine issue of fact as to the conspiracy's existence. The only evidence of a conspiracy plaintiffs proffered was the letter sent by Town Supervisor Breese to plaintiff Catalano on the Monday following the overcrowding incident. In that letter, Breese commented that "I have been told that your marketing efforts to draw crowds to this event included radio commercials – targeting teens who live within the city limits to come to Henrietta for a good time. Well, they certainly came didn't they? I saw the pictures." He also stated, in the portion relevant to the conspiracy claim, that:

> *In discussions today with Town Board members it is clear that there is a strong consensus* that you immediately discontinue your "teen dances" until further notice. As you know you have a special use permit which can be revoked or amended.

(emphasis added; other emphasis removed).

This evidence alone is insufficient to defeat summary judgment on the conspiracy claim. Although a conspiracy "need not be shown by proof of an explicit agreement," a plaintiff must demonstrate at least that "'parties have a tacit understanding to carry out the prohibited conduct.'" *Thomas*, 165 F.3d at 146 (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995)). Even viewing the evidence proffered by plaintiffs in the light most favorable to them, we cannot draw a reasonable inference from this evidence alone that the members of the Town Board had even a tacit understanding to amend the special use permit as a way of keeping African-American teenagers out of Henrietta. Nor does this evidence suffice to support a fact-

25

finder's conclusion that the three members of the Board (whose comments would permit a jury to find that they *individually* acted with racial animus) had an understanding among themselves to do so. Accordingly, we cannot say that "a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Readco, Inc.*, 81 F.3d at 298. We therefore conclude that the district court properly granted summary judgment to the defendants on the conspiracy claim.

**IV. Immunity Defenses**

Before the district court, defendants raised a number of immunity defenses. Because the district court granted defendants summary judgment on all of plaintiffs' federal law claims (and dismissed the claims arising under state law without prejudice), it did not reach the immunity defenses. We have held that "[w]hen a district court fails to address an immunity defense, it is generally appropriate to remand the case with instructions to rule on the matter." *Francis v. Coughlin*, 849 F.2d 778, 780 (2d Cir. 1988) (per curiam) (citing *Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988); *Smith v. Reagan*, 841 F.2d 28, 31 (2d Cir. 1988)); *see also Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988) ("It is our practice in this Circuit when a district court fails to address the qualified immunity defense to remand for such a ruling."). *But see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) (acknowledging the general rule but declining to remand where there was an extensive factual record and where, as a matter of law, defendants would not be entitled to qualified immunity on the basis of that record). Given that the parties here have barely addressed the issues raised by the immunity defenses in their briefs to this court,

26

we think it prudent to follow the usual course in this type of case and allow the district court to consider the immunity defenses in the first instance.[8]

**CONCLUSION**

For the foregoing reasons, we VACATE the district court's grant of summary judgment on the substantive due process claim, and thus on the Section 1983 cause of action, AFFIRM its grant of summary judgment on the equal protection and conspiracy claims, and REMAND for further proceedings consistent with this opinion.

---

[8] Below, plaintiffs also raised several state law causes of action that the district court dismissed without prejudice. We do not consider the validity of these claims here because plaintiffs do not address them in their brief. To the extent, however, that the district court's dismissal of these claims was based solely on its erroneous determination that no federal claim survived summary judgment, they must, of course, be reinstated.