Maureen **FLAHERTY**, Plaintiff,

v.

**MASSAPEQUA PUBLIC SCHOOLS,** Massapequa Board of Education, and Arlene Martin, Christine Perrino, and Marianne Fisher, in their official capacities and individually, Defendants.

No. 08–cv–2298 (ADS)(ETB).

United States District Court, E.D. New York.

Nov. 9, 2010.

Leeds Morelli & Brown, PC, by: Rick Ostrove, Esq., Matthew Scott Porges, Esq., of Counsel, Carle Place, NY, for the plaintiff.

Sokoloff Stern LLP, by: Steven C. Stern, Esq., Melissa Lauren Holtzer, Esq., of Counsel, Westbury, NY, for the defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Plaintiff Maureen Flaherty, the former Superintendent of Schools for the Massapequa Public Schools, alleges that defendant Massapequa Public Schools, along with the Massapequa Board of Education (together, the "District Defendants") and Massapequa Board of Education members Arlene Martin, Christine Perrino, and Marianne Fisher, violated her employment contract and discriminated against her on the basis of gender and perceived sexual orientation. Presently before the Court are two motions: (1) a motion by the plaintiff for leave to serve a late notice of claim, and (2) a motion by the defendants for summary judgment on all of the plaintiff's causes of action. For the reasons set forth below, the Court denies the plaintiff's motion for leave to file a late notice of claim, and grants in part and denies in part the defendants' motion for summary judgment.

## I. BACKGROUND

The Massapequa Board of Education (the "School Board") is an elected five-member body that manages the Massapequa Union Free School District (the "Massapequa Public Schools"), a district that serves several thousand students in southern Nassau County, New York. During the summer of 2005, the School Board hired the plaintiff Maureen Flaherty, Ph.D., to be the district's Superintendent of Schools for a three year term. Flaherty's employment contract provided for an annual salary of $200,000, and permitted Flaherty to be terminated only for cause. The contract also required that each party give timely notice if either did not intend to extend the contract beyond its initial three year term.

Flaherty's first day as superintendent was September 11, 2005, and the School Board's first evaluation of Flaherty's performance four months later in January 2006 suggests that Flaherty progressed smoothly during this initial period. However, by the end of Flaherty's first year at the Massapequa Public Schools, when the School Board gave Flaherty a formal year end review in June 2006, obvious tension had surfaced between Flaherty and the School Board. In that review, the board members expressed concern about Flaherty's performance, and were particularly critical of her "personal qualities and growth." (Stern Aff., Ex. J at 227.) While the School Board's evaluation contains some positive comments, all five of the School Board members found that

Flaherty's ability to "[d]emonstrate outstanding leadership qualities with the ability to delegate as needed," either "need[ed] improvement" or was "unacceptable." (*Id.*) Similarly, all five board members were dissatisfied with the plaintiff's ability to "exhibit[ ] good judgment, perception and vision." (*Id.*) The School Board also suggested to Flaherty that she "[c]ontinue working to keep anger in control," (*id.* at 230), and concluded by requesting an "action plan" from Flaherty "to demonstrate how the concerns stated will be addressed." (*Id.* at 231.)

Following this evaluation, the School Board's relationship with Flaherty did not improve. On September 13, 2006, the School Board sent Flaherty a letter stating that they were still waiting for a "progress report" on the "action plan," they had requested in the June review. (Stern Aff., Ex. K.) Then, in early December 2006, the School Board informed Flaherty that her contract would not be renewed. Minutes from a board meeting in January 2007 reflect an ever-worsening relationship between the School Board and Flaherty following the board's decision not to extend her contract. The School Board expressed sentiments in these minutes such as "[a] unified approach or direction has not been provided so there is a lack of vision or direction as to where the district is going," and "[t]here have been lapses in professional approach [by Flaherty]." (Stern Aff., Ex. L at 236.) The parties agree that the School Board ultimately "did not trust" Flaherty (Defs.' 56.1 Stmt., ¶ 242; Pl.'s 56.1 Stmt., ¶ 242)—although Flaherty asserts that the School Board's lack of trust was "unjustified." (Pl.'s 56.1 Stmt., ¶ 242.)

By the end of Flaherty's second year in the Massapequa Public Schools, the School Board's relationship with Flaherty had reached a breaking point. In the School Board's formal year-end evaluation of Flaherty in June 2007, four out of five board members found that Flaherty's judgment and leadership were "unacceptable," and even the fifth board member still found that her judgment and leadership "need[ed] improvement." (Stern Aff., Ex. N at 237.) The School Board's comments in the June 2007 evaluation are almost universally negative, and include a note that "Board should not be dismissed or hung up on," (*id.* at 239), an apparent reference to an incident where Flaherty terminated a telephone call with defendant and School Board member Christine Perrino while Perrino was still talking. Flaherty does not deny the incident, but rather explains that she was being "attacked" by Perrino, and that she had "repeatedly and unsuccessfully" told Perrino that she needed to attend a meeting. (Pl.'s 56.1 Stmt., ¶¶ 221, 223.) However, Flaherty also admits that, following the conversation with Perrino, she slammed the door to then-deputy superintendent Charles Sulc's office and shouted "that fucking Perrino." (Flaherty Dep. at 250–53.) Flaherty also admits that, at one point, as a "joke", she called three women on the School Board "a bunch of high school girls." (Pl.'s 56.1 Stmt., ¶ 217.)

In late June 2007, the School Board voted unanimously to charge Flaherty with "insubordination, conduct unbecoming a superintendent" and "inefficiency, incompetency, neglect of duty," and provided Flaherty with forty-five written specifications in support of terminating her contract for cause. (Stern Aff., Ex. O at 275, 281.) The specifications included allegations that "[t]he Superintendent has evidenced disrespect of individual Board members via the use of vulgarity, hanging up on a Board member, [and] intentionally ignoring Board members at District functions," and that "[t]he Superintendent has failed to treat community members with dignity and respect within the context of

public meetings." (*Id.* at 276, 281.) The School Board then suspended Flaherty with pay, banned her from the school district's property, and informed the parents of children in the school district that Flaherty had been suspended.

Before any formal hearing was held with regard to her termination, Flaherty and the School Board reached a settlement concerning the charges against her. Ultimately, Flaherty remained on the school district's payroll through the end of her three year contract, but she never returned to work. Flaherty was paid her base salary—which had been raised to $208,000 the year before—for the final year of her contract, but she was not paid her contractual $400 per month car allowance or permitted to "sell back" unused vacation days for additional pay. After Flaherty's contract ended, then-Deputy Superintendent Charles Sulc was hired to serve as superintendent with a base salary of $240,000.

On June 9, 2008, before Flaherty's employment with the Massapequa Public Schools officially terminated, Flaherty commenced this action in federal court. In her amended complaint, filed August 14, 2008, Flaherty alleges, first, that the District Defendants breached her contract, primarily by improperly conducting evaluations of her and improperly holding board meetings from which she was excluded. Second, Flaherty asserts that the defendants violated (1) 42 U.S.C. § 1983 and the Equal Protection Clause and (2) the New York Human Rights Law, by failing to renew her contract and suspending her based on their perception that she was a lesbian. The Court notes that Flaherty identifies herself as a heterosexual. Finally, Flaherty asserts that the District Defendants violated the Equal Pay Act, 29 U.S.C. § 206(d), by paying Charles Sulc, her successor and a male, a higher base salary than she was paid.

In support of her Section 1983 and New York Human Rights Law claims, Flaherty describes her tenure as superintendent very differently than the statements in her performance reviews. In Flaherty's narrative, the School Board members pried into her personal life and discriminated against her because they believed she was a lesbian. Flaherty cites to a handful of incidents in support of her assertions, all of which are supported by her testimony alone.

Describing the first of these incidents, Flaherty states that during a lunch with School Board member and defendant Arlene Martin in August 2005—after Flaherty had signed her contract but before she was on the district payroll—Martin asked whether Flaherty was or had been married. Flaherty viewed these questions as inappropriate and as an "attempt to identify [her] as a member of the gay community." (Flaherty Dep. at 155:15–16) Flaherty suspected that Martin asked these questions because Martin had heard rumors about Flaherty's sexuality.

The next event that Flaherty describes is a telephone conversation with School Board member and defendant Christine Perrino in February 2006. During the call, Perrino presented a report on student clubs, and then told Flaherty that she was particularly interested in a club called the Gay–Straight Alliance. Perrino told Flaherty that she had a brother who died from AIDS, and that "it's a difficult lifestyle but you understand that Maureen." (*Id.* at 186:11–12.) Flaherty viewed this again as an inappropriate effort to "fish[ ]" for her sexual orientation. (*Id.* at 186:18.)

The third event that Flaherty points to occurred one year later, in February 2007, which was approximately two months after the School Board had told Flaherty that

her contract would not be renewed. As background to this third event, the School Board had learned that two employees in Flaherty's former school district had been accused of making "terrorist threats" within that school district. (*Id.* at 197:13–24.) The parties do not further describe the nature of the threats. Flaherty had hired these two employees while working in her previous job, and the School Board sought reassurance from her that she was in no way involved in the two employees' misdeeds. The School Board therefore called a special meeting, and ultimately the issue was resolved. However, according to Flaherty, when the discussion turned to the fact that the two employees had identified themselves as lesbians, the defendant and School Board member Martin said "in a very contentious, derisive voice, 'You hired gays?'." (*Id.* at 196:2–3.) Although all five School Board members were present for this meeting, there is no evidence that any of them, including Martin, recalls this comment.

Flaherty also states that approximately one month later, in March 2007, an attorney named Randi Glasser, who represented the Massapequa Public Schools, recounted to Flaherty that Glasser's son had asked her what she would do if he was gay. Glasser told Flaherty that she had responded that she would love her son no matter what, but that she would hope he wasn't gay because "it is a very difficult lifestyle." (*Id.* at 201:21–22.) According to Flaherty, Glasser then said to her, "[d]on't you think it's a very difficult lifestyle, Maureen?" (*Id.* at 201:24–25.)

Finally, the next month, April 2007, Flaherty had a second conversation with defendant and School Board member Perrino concerning the Gay–Straight Alliance. Flaherty states that, during this conversation, Perrino told Flaherty that she thought "it was great that the students had organized the Gay–Straight Alliance," and that the students "need all sorts of role models married, single, gay. Like you Maureen." (*Id.* at 190:21–23, 192:6–7.) Flaherty viewed this again as "another intrusive attempt to determine sexual orientation." (*Id.* at 191:18–20.)

Based primarily on these five incidents, Flaherty seeks to show that the defendants discriminated against her on the basis of her perceived sexuality. The defendants not only deny that these events occurred, but they also deny that they show any discriminatory animus.

One thing that the parties do agree on is that Flaherty never served a notice of claim on the defendants concerning her state law claims. However, on September 11, 2009, exactly one year after Flaherty's employment contract expired, Flaherty moved for leave to serve a late notice of claim. That motion remains pending before the Court, and the defendants oppose this request.

Then, on April 19, 2010, the defendants moved for summary judgment to dismiss all of the plaintiffs' claims. First, the defendants contend that all of the plaintiff's state law claims are barred by the plaintiff's failure to timely file a notice of claim. Second, the defendants maintain that there are no triable issues of fact concerning the non-discriminatory reason for Flaherty's termination. Finally, the defendants argue that the plaintiff's Equal Pay Act claim is not valid because the pay offered to Flaherty's successor reflected legitimate cost of living adjustments and her successor's greater experience in the district. The plaintiff opposes the defendants' motion in its entirety.

## II. DISCUSSION

### A. As to the Plaintiff's Motion to File a Late Notice of Claim

Flaherty asserts state law causes of action against the defendants for (1) breach

of contract and (2) employment discrimination pursuant to the New York Human Rights Law, New York Executive Law § 296. Flaherty admits that she did not serve a notice of claim on the defendants for either cause of action, and does not contest that her failure to timely serve a notice of claim would ordinarily bar these claims. However, Flaherty requests that the Court exercise its statutorily-authorized discretion to grant her leave to file a late notice of claim, on the ground that the defendants had actual timely notice of her claims. The defendants oppose this motion based on, among other contentions, an assertion that the plaintiff's motion to serve a late notice of claim was itself tardy.

As a preliminary matter, there is some dispute as to whether the plaintiff's notice of claim requirements are governed by New York Education Law § 3813, New York Municipal Law § 50–e, or both. This is relevant because, while Section 50–e arguably permits only state courts to grant leave to file a late notice of claim, Section 3813 permits any "court"—including this Court—to grant leave to file a late notice. *See EUA Cogenex Corp. v. North Rockland Cent. School Dist.,* 124 F.Supp.2d 861, 864 (S.D.N.Y.2000).

This issue is readily resolved. Whereas Section 3813 applies to all causes of action asserted against a school district, a school board, or school board members, Section 50–e explicitly applies only to tort claims. Thus, because the plaintiffs' causes of action do not sound in tort, the only applicable provision here is New York Education Law § 3813. *See, e.g., EUA Cogenex Corp.,* 124 F.Supp.2d at 863–64 (noting that Section 50–e applies only to tort claims, and that Section 3813 applies to all state claims asserted against a school district); *Picciano v. Nassau County Civil Serv. Comm'n,* 290 A.D.2d 164, 169, 736 N.Y.S.2d 55, 60 (2d Dep't 2001) (it is "well-settled law that a cause of action under the Human Rights Law is not categorized as a tort for notice of claim purposes"). The Court therefore has the power to grant the plaintiff leave to file a late notice of claim.

■ Generally, under Section 3813(1), a plaintiff seeking to proceed in court against a school district must present a written verified claim to the governing body of the school district within three months of the claim's accrual. Section 3813(1); *Parochial Bus Sys., Inc. v. Bd. of Educ.,* 60 N.Y.2d 539, 547, 470 N.Y.S.2d 564, 458 N.E.2d 1241 (1983) (holding that a failure to present a claim to a school district within ninety days of its accrual is a fatal defect). However, should a plaintiff fail to meet this deadline, Section 3813(1) also provides that a court may, "in its discretion, extend the time to serve a notice of claim," although in all cases, "[t]he extension shall not exceed the time limited for the commencement of an action by the claimant against any district or any such school." Section 3813(1). Therefore, a court may not permit a late notice of claim if a plaintiff sought leave to file the claim after the statute of limitations for the relevant claim had expired. *Kingsley Arms, Inc. v. Copake–Taconic Hills Cent. Sch. Dist.,* 9 A.D.3d 696, 697, 780 N.Y.S.2d 805, 807 (3d Dep't 2004); *see also Stevens v. Bd. of Educ. of McGraw Cent. Sch. Dist.,* 261 A.D.2d 698, 699, 689 N.Y.S.2d 730 (2d Dep't 1999).

■ The applicable statute of limitations for all state law claims brought against a school district, a school board, or a school board member is one year. New York Education Law § 3813(2–b); *Henry Boeckmann, Jr. & Assocs. v. Bd. of Educ., Hempstead Union Free Sch. Dist. No. 1,* 207 A.D.2d 773, 775, 616 N.Y.S.2d 395, 397 (2d Dep't 1994). Therefore, for the Court to permit a late notice of claim here, the

plaintiff must have moved for leave to file a late notice within a year of the accrual of her state law claims, regardless of the timeliness of her complaint.

In this case, the plaintiff did not move to serve a late notice of claim until September 11, 2009, which was fifteen months after she commenced the present action, and thirteen months after she filed her amended complaint. Thus, the plaintiff's position that she timely moved to serve a late notice of claim appears untenable. The plaintiff moved to serve a late notice of claim more than a year after filing *her complaint*, strongly suggesting that the motion was also made more than a year after her causes of action accrued.

■ The plaintiff attempts to avoid this problem by asserting that, although she commenced this action in June 2008, her state law claims did not in fact accrue until September 11, 2008, when she ceased to be an official employee of the Massapequa Public Schools. In the Court's view, this argument fails with respect to both of the plaintiff's state law causes of action. First, with respect to the plaintiff's breach of contract claim, it is well-settled that a breach of contract cause of action accrues at the time that the breach occurs. *Ely–Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 615 N.E.2d 985, 986–87 (N.Y.1993); *Morning v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 28 Misc.3d 653, 902 N.Y.S.2d 784, 790 (Sup.Ct.N.Y.Co.2010). Flaherty alleges numerous breaches of her contract, but all of them are alleged to have occurred before her employment actually terminated. To the extent that the plaintiff asserts that the failure to renew her contract was itself a breach, the Court has reviewed the plaintiff's employment contract and finds that its plain language provides that the plaintiff had no contractual right to renewal.

■ Similarly, the one year statute of limitations on the plaintiff's New York Human Rights Law claim had also run by September 11, 2009. Generally, "[a] cause of action for discrimination under N.Y. Human Rights Law accrues and the limitation period begins to run on the date of the alleged discriminatory act." *Queensborough Cmty. Coll. of City Univ. of N.Y. v. State Human Rights*, 49 A.D.2d 766, 372 N.Y.S.2d 722, 723 (2d Dep't 1975). The School Board decided against renewing Flaherty's contract in the fall of 2006, and communicated its decision to Flaherty in December of that year. The board then voted to suspend Flaherty and to assert disciplinary charges against her in June 2007, and the parties settled those charges in August 2008. Flaherty does not allege any discriminatory act after the settlement in August 2008. Therefore, any claim that Flaherty had under the New York Human Rights Law accrued prior to her contract's expiration. *See Pinder v. City of New York*, 49 A.D.3d 280, 853 N.Y.S.2d 312 (2008) (explaining that the possibility that an adverse employment decision may be reversed is insufficient to toll the statute of limitations); *see Jamieson v. Poughkeepsie City School Dist.*, 195 F.Supp.2d 457, 467 (S.D.N.Y.2002) (explaining that a plaintiff's claim accrues on the date that an adverse decision is made even though a lame duck board could possibly overturn that decision).

Nevertheless, the plaintiff asserts that, because the damages associated with her state law causes of action were uncertain until the time that her employment terminated, her causes of action did not accrue until September 11, 2008. However, the Court finds the cases on which the plaintiff relies for this proposition to be inapposite to the present facts. *Cf. Scherman v. Bd. of Ed. of Sch. Dist. No. 1, Town of Hempstead*, 44 A.D.2d 831, 832, 355 N.Y.S.2d

162, 163 (2d Dep't 1974) (holding that a plaintiff's cause of action did not accrue on the date that he was first dismissed because the Commissioner of Education had issued an order reinstating the plaintiff soon after); *cf. Hoger v. Thomann,* 189 A.D.2d 1048, 1049–50, 592 N.Y.S.2d 887, 888–89 (3d Dep't 1993) (holding that a wrongful termination claim accrued on the date that the plaintiff was terminated, not on the date that her supervisor evaluated her performance). Moreover, the disciplinary charges and suspension imposed on the plaintiff, as well as the parties' subsequent settlement agreement, left no doubt that the plaintiff would not be working for the defendants after September 11, 2008. Thus, there was no material uncertainty as to damages after the August 2008 settlement agreement.

Therefore, because the plaintiff did not move to serve a late notice of claim within a year of the accrual of her state law causes of action, the Court denies the plaintiff's motion to serve a late notice of claim. Accordingly, as the plaintiff has not satisfied the notice of claim requirement of New York Education Law § 3813, the Court dismisses all of the plaintiff's state law causes of action.

## B. As to the Defendants' Motion for Summary Judgment

### 1. Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under Fed.R.Civ.P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### 2. As to the Plaintiff's Section 1983 Equal Protection Cause of Action

The plaintiff asserts a cause of action pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause for employment discrimination on the basis of her perceived sexual orientation. The defendants move for summary judgment on this claim

and assert, among other things, that there is no triable issue of fact as to whether the defendants were motivated by discriminatory animus.

As a preliminary matter, the defendants assert that the plaintiff is barred from asserting an Equal Protection claim because she is not a member of a protected class. The gist of the defendants' argument is that people "perceived as gay" are not in a protected class for purposes of the Equal Protection Clause, and that the plaintiff's only remaining avenue for asserting an equal protection claim is to proceed under a "class of one" theory. However, the defendants assert that the Supreme Court's recent decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 128 S.Ct. 2146, 2156, 170 L.Ed.2d 975 (2008), bars "class of one" equal protection claims in the public employment context.

The law in this area remains somewhat unsettled. However, in the Court's view, it is likely that a person perceived as homosexual is in a protected class for equal protection purposes. *See, e.g., Vega v. Artus*, 610 F.Supp.2d 185, 209–10 (N.D.N.Y. 2009) (treating perceived sexual orientation as a protected class); *Levarge v. Preston Bd. of Education*, 552 F.Supp.2d 248, 253 (D.Conn.2008) (same); *but see also, Emblen v. Port Authority of New York/New Jersey*, No. 00–cv–8877, 2002 WL 498634, *7 (S.D.N.Y.2002) (treating an equal protection claim for discrimination based on perceived sexual orientation as a "class of one" claim). Nevertheless, the Court need not definitively resolve this issue. Even assuming that the plaintiff is a member of a protected class, the Court ultimately finds that she cannot meet her burden of showing that the defendants' conduct was discriminatorily motivated. Therefore, for the purposes of this motion, the Court assumes that the plaintiff is a member of a protected class for equal protection purposes.

In the Second Circuit, employment discrimination claims brought under the Equal Protection Clause are analyzed using the familiar three-step *McDonnell Douglas* burden shifting test developed for Title VII employment discrimination claims. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In the first step of this burden shifting test, the plaintiff must establish a prima facie case of discrimination by showing that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell University*, 584 F.3d 487, 498 (2d Cir. 2009). An inference of discrimination may be drawn either from (1) direct evidence of discriminatory intent, or (2) a showing by the plaintiff that "[she] was subjected to disparate treatment ... [compared to persons] similarly situated in all material respects to ... [herself]." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000) (internal quotations and citations omitted). Generally, the plaintiff's burden in establishing a prima facie case of discrimination is "minimal." *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000).

Then, if the plaintiff establishes all the elements of the prima facie case, the burden shifts to the defendants to "articulate some legitimate, nondiscriminatory reason for the adverse act." *Leibowitz*, 584 F.3d at 498 (internal quotations and citations omitted). If the defendant succeeds in doing so, the plaintiff then has the burden to "demonstrate by competent evidence that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination." *Id.*

### a. Step One: The Prima Facie Case

The Court has already assumed that the plaintiff has established the first prong of the prima facie case—that she is a member of a protected class—and neither party disputes that the plaintiff was qualified to serve as school superintendent, thereby satisfying the second prong of the prima facie case. Similarly, while the plaintiff was not contractually entitled to an extension of her employment contract, the defendants' decision not to extend it was an adverse employment action, satisfying the third prong of the prima facie case. *See Leibowitz*, 584 F.3d at 501. There is some dispute as to whether Flaherty's suspension without pay was also an adverse employment action, but as it is not determinative to the outcome here, the Court assumes that it was.

As for the fourth prong of the prima facie case, the plaintiff relies primarily on statements from the School Board members to show discriminatory intent. However, before addressing these statements in detail, the Court notes that the plaintiff also suggests that the defendants demonstrated discriminatory intent when "another District employee" named Ellen Semmell "who is married and who the District was going to terminate, was granted tenure and allowed to continue working for one year before she was required to tender her resignation." (Pl.'s Resp. at 20.)

In the Court's view, the plaintiff's reliance on Ellen Semmell to show discriminatory intent is misplaced. To show discriminatory intent through a comparator, the person treated differently must be "similarly situated" to the plaintiff in "all material respects." *Norville v. Staten Island University Hosp.*, 196 F.3d 89, 96 (2d Cir.1999). This includes a showing that the comparator was "subject to the same standards governing performance evaluation and discipline, and [ ] engaged in conduct similar to the plaintiff's ...." *Id.* Here, not only does the plaintiff fail to demonstrate how Semmell is similarly situated to her in all material respects, but she fails even to state what position Semmell held, when she was terminated, or the reason for her dismissal. Thus, the Court does not view Semmell as a relevant comparator.

As for direct evidence of discrimination, the plaintiff relies on six alleged statements:

(1) Arlene Martin's August 2005 question about whether the plaintiff was married;

(2) Christine Perrino's February 2006 comments showing interest in the Gay–Straight Alliance and noting that being gay was a "difficult lifestyle";

(3) Martin's February 2007 remark to the plaintiff, "You hired gays?";

(4) School District Attorney Randi Glasser's March 2007 comments concerning her son asking questions about being gay;

(5) Perrino's April 2007 comment indicating support for the Gay–Straight Alliance and suggesting that the plaintiff was a good gay role model; and

(6) an uncited and undated comment recounted in the plaintiff's memorandum of law from Arlene Martin to one Gary Slavin that "[Flaherty] is not the person we thought she was and I had to get rid of her." (Pl.'s Resp. at 19.)

In the Court's view, the only statement among these that supports an inference of discriminatory animus against perceived-homosexuals is Martin's February 2007 comment to the plaintiff, "You hired gays?" To be sure, Flaherty's testimony concerning this statement is uncorroborated by the five other individuals in the

room at the time, but the plaintiff's testimony nevertheless raises an issue of fact as to whether this statement was made.

As for Martin's alleged statement that Flaherty was "not the person we thought she was," not only has the plaintiff failed to point the Court to admissible evidence supporting this statement, but the Court also finds that this statement does not show animus towards perceived homosexuals. Similarly, the four remaining statements on which the plaintiff relies also fail to show any animus towards persons perceived as gay. At most, these comments demonstrate curiosity about the plaintiff's sexual orientation, and in at least one case, the comments are on their face supportive of homosexuals.

■ Nevertheless, as stated above, the burden for proving a prima facie case of discrimination is "minimal." *Schnabel*, 232 F.3d at 87. Therefore, the Court finds that the evidence of Martin's alleged statement "You hired gays?" is sufficient to satisfy the plaintiff's burden of showing discriminatory intent.

### b. Step Two: The Defendants' Non–Discriminatory Reason

The plaintiff having satisfied her burden of establishing a prima facie case of discrimination, the defendants must state a non-discriminatory reason for the plaintiff's non-renewal and suspension. Here, the defendants state that they acted as they did based on Flaherty's poor job performance. Having proffered this reason, the defendants have satisfied their burden.

### c. Step Three: The Plaintiff's Showing of Pretext and Actual Discrimination

Once the defendants offer a non-discriminatory reason for the relevant adverse employment actions, the plaintiff once again takes on the burden of showing by a preponderance of the evidence that the defendants' reason is a pretext for actual discrimination. In the context of a motion for summary judgment, the Court must determine at this final step whether, taking the facts in the best light for the plaintiff, the plaintiff can meet its burden of proving that the defendants' explanation was a pretext for actual discriminatory animus.

■ The Court finds that the plaintiff cannot meet this burden. First, the defendants have offered overwhelming and uncontroverted evidence showing that they were unsatisfied with Flaherty's performance—and that evaluation of a superintendent is a critical obligation of the School Board members. The School Board's first annual review of Flaherty reflects that, after nine months of employment, not a single board member expressed satisfaction with Flaherty's "leadership", "judgment, perception, [or] vision," (Stern Aff., Ex. J at 227). At fifteen months, the School Board's records show similar concern, stating, among other things, that "[t]here have been lapses in professional approach [by Flaherty]." (Stern Aff., Ex. L at 236.) The plaintiff's June 2007 performance review is abysmal, shows a worsening view of her leadership and judgment, and includes comments such as "[i]nterpersonal skills are lacking," and "[d]on't sense any team building having taken place." (Stern Aff., Ex. N at 240.) The charges levied against Flaherty shortly thereafter express the same concerns.

Flaherty further admits to hanging up on a School Board member, whom she then referred to as, "that fucking Perrino." (Pl.'s 56.1 Stmt., ¶¶ 221, 223; Flaherty Dep. at 250–53.) Flaherty also does not deny that she called three women on the School Board "a bunch of high school girls" and that she told a parent at a school board meeting to slow down and not

speak like a "used car salesman." (Pl.'s 56.1 Stmt., ¶¶ 217, 219.) In each case, Flaherty asserts that her statements were taken out of context, and that in some cases, they were misunderstood jokes. However, even taking the evidence in the best light for the plaintiff, the plaintiff's admissions demonstrate that the School Board's concerns were not entirely without basis.

By contrast, the single piece of evidence that the plaintiff has offered to show that the defendants discriminated against her is her recounting of Martin's statement, "You hired gays?" However, while Flaherty testified that Martin's statement was "contentious [and] derisive" (Flaherty Tr. at 196:2–3), she offers no evidence of any follow up to this statement or agreement by other board members. The Court therefore does not find that this comment expressed the views of the other members of the School Board. This is particularly relevant because the School Board voted unanimously not to rehire and later to suspend Flaherty.

Further, Martin's statement was also not made until two months after Flaherty was told that her contract would not be renewed, and eight months after the School Board first recorded in writing that they were concerned about Flaherty's leadership and judgment. In fact, Flaherty asserts that the School Board was still "attempt[ing] to determine [her] sexual orientation," (Flaherty Aff. at 191:18–20), two months after Martin allegedly made this comment, and four months after Flaherty had been told that her employment would not be extended.

In the Court's view, this single alleged statement is insufficient to create a triable issue of fact. *See Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) ("[S]tray remarks alone do not support a discrimination suit." (internal quotation marks omitted)). While stray remarks may take on "more ominous" meaning when placed in context, *id.,* the Court finds that the plaintiff has failed to offer evidence that demonstrates a context rendering this remark more serious. Rather, the undisputed evidence in this case shows that the School Board had long before expressed serious disappointment with the plaintiff's performance, and this had nothing to do with her perceived sexual orientation.

The plaintiff has pointed to a number of her achievements as superintendent to show that the School Board's criticism of her was unfounded, and there are unresolved factual disputes concerning the quality of Flaherty's work as a school superintendent. However, it is not the Court's role to determine whether an employer acted wisely in taking an adverse employment action. Rather, the law prohibits making employment decisions for discriminatory reasons. *See, e.g., Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir. 1998) (employment discrimination law "does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*" (emphasis in original)). Here, there are no triable issues of fact concerning the defendants' *view* of Flaherty's performance: the defendants were plainly unimpressed with Flaherty on the merits. The single statement suggesting, perhaps, that one board member harbored personal animus against homosexuals is insufficient to show that this discontent was a feigned pretext a for discriminatory animus against the plaintiff.

Finding that the plaintiff cannot meet her burden of showing actual discrimination, the Court dismisses the plaintiff's Section 1983 Equal Protection employment discrimination claim. The Court further notes that, as the plaintiff's New York Human Rights Law cause of action and

the plaintiff's Section 1983 cause of action were the only claims asserted against Perrino and Martin, both Perrino and Martin should now be terminated as defendants in this case. Similarly, as the plaintiff has asserted no causes of action against named defendant Marianne Fisher, she is also terminated as a defendant.

### 3. As to the Plaintiff's Equal Pay Act Cause of Action

The plaintiff separately asserts against the District Defendants a cause of action pursuant to the Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"). The plaintiff bases her claim on the fact that her successor, Charles Sulc, was paid $240,000 in annual salary when he started work as superintendent, while she was paid a salary of only $208,000 when her contract expired. The District Defendants assert that Sulc's higher pay was the non-discriminatory result of cost of living increases and Sulc's long tenure in the Massapequa Public Schools.

The EPA proscribes paying lower wages to an employee of one sex when an employee of the opposite sex does materially the same work for greater pay. Section 206(d)(1). To evaluate a claim under the EPA, the Second Circuit has established a burden shifting test somewhat akin to the *McDonnell Douglas* test. In the first step of this test, the plaintiff must establish a prima facie violation of the EPA by showing that "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Ryduchowski v. Port Authority of New York and New Jersey,* 203 F.3d 135, 142 (2d Cir.2000) (quoting *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999)) (internal quotations omitted). A

plaintiff need *not* demonstrate an employer's intent to discriminate to establish a prima facie case under the EPA. *Id.*

Upon the establishment of a prima facie case of pay discrimination, the defendants undertakes a burden of *persuasion* (as opposed to the mere burden of production in the Title VII context) to show, by a preponderance of the evidence, that the pay differential is attributable to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Section 206(d)(1); *Ryduchowski,* 203 F.3d at 142. Generally, this burden "is a heavy one, because the statutory exemptions are narrowly construed." *Id.* (citing *Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 843 (6th Cir.1997) and *EEOC v. Aetna Ins. Co.,* 616 F.2d 719, 724 (4th Cir.1980)) (internal quotations omitted).

Should a defendant succeed in carrying this burden, a plaintiff may then "counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi,* 191 F.3d at 136; *Ryduchowski,* 203 F.3d at 142.

Here, the Court is satisfied that the plaintiff has established a prima facie case of pay discrimination under the EPA. Both Flaherty and Sulc performed the same essential duties under similar conditions while each was the school superintendent. However, Sulc, a man, was paid more than Flaherty, a woman. The only wrinkle in establishing a prima facie case here is that Sulc began work in the fall of 2008, while Flaherty's final pay reflected the pay rate for her job in 2006. Because of the effect of cost of living increases in salary, the

Court cannot directly compare Flaherty's 2006 salary with Sulc's 2008 salary.

Nevertheless, for comparison purposes, the Court can calculate what Flaherty's salary would likely have been in 2008. First, Flaherty received a 4% salary increase at the end of her first year of employment, so the Court can reasonably assume that she would have received the same increase at the end of her second year of employment had she not been suspended. Similarly, the Court assumes that Flaherty would have received another 4% raise at the end of the third year of work had her contract been renewed. Thus, the Court calculates the plaintiff's hypothetical 2008 salary to be $224,972.80. This is still approximately $15,000 less than Sulc's actual 2008 salary, so that the plaintiff has established a prima facie case under the EPA.

In response, the District Defendants assert that Sulc's increased pay reflected (1) his forty years of service with the Massapequa Public Schools and the stability he brought to the position, (2) the fact that he served as acting superintendent during the 2007–2008 school year without additional compensation, and (3) the fact that, given the length of time he had spent in the school district, Sulc was already earning $219,990.97 in total compensation as deputy superintendent. Flaherty does not dispute that Sulc served in the Massapequa Public Schools for decades, nor does she dispute that, from July 2007 to July 2008, Sulc served as acting superintendent without additional compensation.

Based on these facts, the District Defendants essentially argue that the pay differential between Flaherty and Sulc was "a differential based on any other factor other than sex." Section 206(d)(1). The Second Circuit has held that a defendant seeking to invoke the "factor-other-than-sex" defense must show that a "bona fide business-related reason exists for using the gender-neutral factor that results in a wage differential." *Aldrich v. Randolph Cent. School Dist.,* 963 F.2d 520, 526 (2d Cir.1992). The District Defendants face a particularly high bar in seeking summary judgment on this affirmative defense, as they must show that *every* reasonable jury would agree that Sulc's higher pay was based on a legitimate business reason.

■ Having reviewed the relevant evidence, the Court finds that the District Defendants have not met that burden. While there is considerable evidence that Sulc's pay was based entirely on non-gender, business considerations, there is at least some valid evidence that calls this into question. For example, while Flaherty held a Ph.D., Sulc did not. Also, the District Defendants claim that Sulc's 2008–2009 pay was intended to compensate him for the work he did as acting superintendent in 2007–2008, and while this might readily explain a special bonus paid in 2008, it is a less convincing explanation for why Sulc's *permanent* base salary was higher than Flaherty's. Finally, while a reasonable jury would likely have to conclude that the District Defendants needed to give Sulc a raise from the $219,990.97 he was earning as deputy superintendent, there is no evidence that Sulc demanded the full $240,000 he received.

Therefore, the Court finds that there are triable issues of fact with respect to the plaintiff's EPA claim, and denies the District Defendants' motion for summary judgment on the plaintiff's EPA claim.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the plaintiff's motion to serve a late notice of claim is denied; and it is further

**ORDERED** that the plaintiff's state law causes of action for breach of contract and violation of the New York Human Rights Law are dismissed for failure to serve a notice of claim; and it is further

**ORDERED** that the defendants' motion for summary judgment on the plaintiff's Section 1983 equal protection cause of action is granted, and that cause of action is dismissed; and it is further

**ORDERED** that the District Defendants' motion for summary judgment on the plaintiff's Equal Pay Act claim is denied; and it is further

**ORDERED** that all causes of action against the individual defendants Arlene Martin, Christine Perrino, and Marianne Fisher are dismissed; and it is further

**ORDERED** that the Clerk of the Court is respectfully directed to amend the caption in this case to read as follows:

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

MAUREEN FLAHERTY,

    Plaintiff,

  -against-

MASSAPEQUA PUBLIC SCHOOLS and MASSAPEQUA BOARD OF EDUCATION,

    Defendants.

**SO ORDERED.**